200 U.S. 561 (1906)
CHICAGO, BURLINGTON AND QUINCY RAILWAY COMPANY
v.
PEOPLE OF THE STATE OF ILLINOIS ex rel. DRAINAGE COMMISSIONERS.
No. 157.
Supreme Court of United States.
Argued December 14, 1905.
Decided March 5, 1906.
ERROR TO THE SUPREME COURT OF THE STATE OF ILLINOIS.
*568 Mr. Albert J. Hopkins, with whom Mr. Robert Bruce Scott and Mr. Chester M. Davis were on the brief, for plaintiff in error.
Mr. John K. Newhall and Mr. John M. Raymond for defendants in error.
*579 MR. JUSTICE HARLAN, after making the foregoing statement, delivered the opinion of the court.
1. The first question is one of the authority of this court to review the judgment below. As we have seen, the railway company insisted in the court of original jurisdiction that the statute under which the Drainage Commissioners proceeded *580 could not be applied in this case without taking its property for public use without compensation, and therefore depriving it of property without due process of law, or without denying to it the equal protection of the laws guaranteed by the Comstitution of the United States. The judgment of the trial court was adverse to that view. In the Supreme Court of the State the railway company, by its assignments of error, preserved its objection based on constitutional grounds. That court did not, in words, refer to the Constitution of the United States, and its opinion concluded: "Entertaining the views above expressed, and founding our conclusion upon the rights and duties of the parties as found in the common law, we deem it unnecessary to pass upon the constitutionality of section 40 1/2 of the Farm Drainage Act."
The contention is that as the state court based its judgment on the common law duty of the railway company, and not expressly on any Federal ground, it cannot be said that there was any denial of the Federal right claimed by the company; consequently, it is argued, this court is without jurisdiction to reexamine the final judgment. Rev. Stat. § 709.
Undoubtedly, the general rule is that where the judgment of the state court rests upon an independent, separate ground of local or general law, broad enough or sufficient in itself to cover the essential issues and control the rights of the parties, however the Federal question raised on the record might be determined, this court will affirm or dismiss, as the one course or the other may be appropriate, without considering that question. But it is equally well settled that the failure of the state court to pass on the Federal right or immunity specially set up, of record, is not conclusive, but this court will decide the Federal question if the necessary effect of the judgment is to deny a Federal right or immunity specially set up or claimed, and which, if recognized and enforced, would require a judgment different from one resting upon some ground of local or general law. And such plainly was the effect of the judgment in this case. If, as the railway company contended, the proposed *581 action of the Drainage Commissioners would deprive it of property without due process of law and also deny to it the equal protection of the laws, then a judgment should have been rendered for the company. And that result could not be avoided merely by silence on the Federal question and by placing the judgment on some principle of the common law. The constitutional grounds relied on must, if sustained, displace or supersede any principle of general or local law which, but for such grounds, might be sufficient for the complete determination of the rights of the parties. The claim of a Federal right or immunity specially set up from the outset went to the very root of the case and dominated every part of it. If that claim be valid, then the law is for the railway company; for, the supreme law of the land must always control. Therefore a failure to recognize such Federal right or immunity, and the decision of the case on some ground of general or local law, necessarily has the same effect as if the claim of Federal right or immunity had been expressly denied. That claim having, then, been distinctly set up by the company, and being broad enough to cover the entire case, it may not be ignored, and this court cannot refuse to determine whether the alleged Federal right exists and is protected by the Constitution of the United States. If the case had been decided in favor of the railway company on some ground of local or general law, then the claim of a Federal right would have become immaterial, and we could not have reexamined the judgment. But the decision was otherwise and was, in law, a denial of the claim of a Federal right.
For these reasons we are of opinion that this court has jurisdiction to reexamine the final judgment of the state court so far as it involved the Federal right or immunity specially set up by the railway company.
2. The concrete case arising upon the petition and the demurrer is this: A public corporation, charged by law with the duty of causing a large body of lands, principally swamp and slough lands, to be drained and made capable of cultivation, *582 has, under direct legislative authority, adopted a reasonable and suitable plan to accomplish that object. That plan requires the enlarging and deepening of the channel of a natural watercourse running through the District, which is the only natural outlet or way of drainage of the lands of the District  the best and only practicable mode by which the lands can be made tillable. But that plan cannot be carried out unless the timbers and stones in the creek  placed there by the railway company when it constructed the foundation for its present bridge  are removed. The timber and stones referred to cannot, however, be removed without destroying the foundations of the present bridge and rendering it necessary (if the railway company continues to operate its road, which we assume it intends to do) to construct another bridge with an opening underneath wide enough to permit a channel sufficient to carry off the water of the creek as increased in volume under the drainage system adopted by the Commissioners.
The contention of the railway company is that, as its present bridge was lawfully constructed, under its general corporate power to build, construct, operate and maintain a railroad, in the county and township aforesaid, and as the depth and width of the channel under it were sufficient, at the time, to carry off the water of the creek as it then flowed, and now flows  the foundation of the bridge cannot be removed and its use of the bridge disturbed, unless compensation be first made or secured to it in such amount as will be sufficient to meet the expense of removing the timbers and stones from the creek and of constructing a new bridge of such length and with such opening under it as the plan of the Commissioners requires. The company insists that to require it to meet these expenses out of its own funds will be, within the meaning of the Constitution, a taking of its property for public use without compensation, and, therefore, without due process of law, as well as a denial to it of the equal protection of the laws.
The importance of these questions will justify a reference to some of the adjudged cases; referring first to those recognizing *583 the distinction between an incidental injury to rights of private property resulting from the exercise of governmental powers, lawfully and reasonably exerted for the public good, and the taking, within the meaning of the Constitution, of private property for public use.
In Transportation Co. v. Chicago, 99 U.S. 635, 642, which involved a claim for damages directly resulting from the construction by the city of Chicago of a tunnel under Chicago River, whereby for a very long time the plaintiff was prevented from using its dock and other property for purposes of its business; in Mugler v. Kansas, 123 U.S. 623, 669, which related in part, to the lawful prohibition by the State of the use of private property in a particular way, whereby its value was materially diminished, if not practically destroyed; in N.Y. & N.E. Railroad Co. v. Bristol, 151 U.S. 556, 567, 571, which involved the question whether a railroad company could be required, at its sole expense, to remove a grade crossing which it had lawfully established and used and to establish another crossing at a different place; in Chicago, Burlington & Quincy R.R. Co. v. Chicago, 166 U.S. 226, 252, in which one of the questions was whether it was a condition of the exercise by the State of its authority to regulate the use of property, owned by individuals or corporations, that the owner should be indemnified for the damage or injury resulting from the exercise of such authority for legitimate public purposes; in Gibson v. United States, 166 U.S. 269, 271, 276, in which the owner of a farm on an island in the Ohio River, at which there was a landing, sought to recover compensation for the injury done to the farm by reason of the construction by the United States of a dike for the purpose of concentrating the waterflow in the main channel of the river; and in Scranton v. Wheeler, 179 U.S. 141, 164, which involved the question whether the United States was required to compensate an owner of land fronting on a public navigable river, when his access from the shore to the navigable part of such river was permanently obstructed by a pier erected in the river under *584 the authority of Congress for the purpose of improving navigation;  in each of those cases, this court recognized the principle that injury may often come to private property as the result of legitimate governmental action, reasonably taken for the public good and for no other purpose, and yet there will be no taking of such property within the meaning of the constitutional guarantee against the deprivation of property without due process of law, or against the taking of private property for public use without compensation. To this class belongs the recent, and as we think, decisive case of New Orleans Gas Light Co. v. Drainage Commission, 197 U.S. 453, to be hereafter adverted to in another connection. In this class may also be placed Mills v. United States, 46 Fed. Rep. 738. That was the case of an improvement by the United States of the navigation of Savannah River, which resulted in so raising the water in that river as to make it impossible to prevent the flooding of adjacent rice fields that were ordinarily and naturally drained into the river, and rendering it necessary that expense be incurred in order to provide new drainage from those fields into a back river, where the water levels were suitable. In commenting upon that case, this court said, in United States v. Lynah, 188 U.S. 445: "Obviously there was no taking of the plaintiff's lands, but simply an injury which could be remedied at an expense, as alleged, of $10,000, and the action was one to recover the amount of this consequential injury. The court rightfully held that it could not be sustained." See also Bedford v. United States, 192 U.S. 217, and Manigault v. Springs, 199 U.S. 473.
We refer also, as having direct application here, to some of the cases, familiar to the profession, that recognize the possession by each State of the power, never surrendered to the Government of the Union, of guarding and promoting the public interests by reasonable police regulations that do not violate the constitution of the State or the Constitution of the United States. Gibbons v. Ogden, 9 Wheat. 1; Railroad Co. v. Husen, 95 U.S. 465, 472; Patterson v. Kentucky, 97 U.S. *585 501, 503; Morgan v. Louisiana, 118 U.S. 455, 464; Hennington v. Georgia, 163 U.S. 299, 308, 309; N.Y., N.H. & H. Railroad Co. v. New York, 165 U.S. 628, 631.
We assume that the drainage statute in question is entirely consistent with the constitution of Illinois. It is so regarded by the Supreme Court of the State, and that is all-sufficient in this case. We assume, also, without discussion  as from the decisions of the state court we may properly assume  that the drainage of this large body of lands so as to make them fit for human habitation and cultivation, is a public purpose, to accomplish which the State may by appropriate agencies exert the general powers it possesses for the common good. By the removal of water from large bodies of land, the state court has said, and by "the subjection of such lands to cultivation they are made to bear their proper proportionate burden to the support of the inhabitants and commerce of the State. Their value is increased, and thereby their contribution in taxes to the state and local governments is increased." C., B. & Q. Ry. Co. v. The People, 212 Illinois, 103, 119. It is conceded that this public purpose cannot be certainly and effectively attained except through the plan adopted by the Drainage Commissioners. Further, the regulations against which the railway company invokes the Constitution have a real, direct, and obvious relation to the public objects sought to be accomplished by them; in no sense are they arbitrary or unreasonable. Indeed, it is admitted that the plan of the Commissioners is appropriate and the best that can be devised for draining the lands in question. But the railway company, in effect, if not in words, insists that the rights which it asserts in this case are superior and paramount to any that the public has to use the watercourse in question for the purpose of draining the lands in its vicinity, although such watercourse was in existence, for the benefit of the public, long before the railway company constructed its bridge. This contention cannot, however, be sustained, except upon the theory that the acquisition by the railway company of a right of way through the lands in *586 question, and the construction on that right of way of a bridge across Rob Roy Creek at the point in question, carried with it a surrender by the State of its power, by appropriate agencies, to provide for such use of that natural watercourse as might subsequently become necessary or proper for the public interests. If the State could part with such a power, held in trust for the public  which is by no means admitted  it has not done so in any statute either by express words or by necessary implication. When the railway company laid the foundations of its bridge in Rob Roy Creek it did so subject to the rights of the public in the use of that watercourse, and also subject to the possibility that new circumstances and future public necessities might, in the judgment of the State, reasonably require a material change in the methods used in crossing the creek with cars. It may be  and we take it to be true  that the opening under the bridge as originally constructed was sufficient to pass all the water then or now flowing through the creek. But the duty of the company, implied in law, was to maintain an opening under the bridge that would be adequate and effectual for such an increase in the volume of water as might result from lawful, reasonable regulations established by appropriate public authority from time to time for the drainage of lands on either side of the creek. Angell on Watercourses, 6th ed. 640, § 465b.
The Supreme Court of Illinois said in this case: "The right of drainage through a natural watercourse or a natural waterway is a natural easement appurtenant to the land of every individual through whose land such natural watercourse runs, and every owner of land along such watercourse is obliged to take notice of the natural easement possessed by other owners along the same watercourse." Again, in the same case: "Where lands are valuable for cultivation, and the country, as this, depends so much upon agriculture, the public welfare demands that the lands shall be drained, and in the absence of any constitutional provision in relation to such laws they have been sustained, upon high authority, as the exercise of the *587 police power. "Further: "A natural watercourse being a natural easement, is placed upon the same ground, in many respects as to the public right, as is a public highway. At the common law, if a railroad or another highway crosses a natural watercourse or a public highway, such highway or railroad must be so constructed across the existing highway or waterway, and so maintained, that said highway or waterway, as the case may be, shall not only subserve the demands of the public as they exist at the time of crossing the same, but for all future time. . . . The great weight of authority is, that where there is a natural waterway, or where a highway already exists and is crossed by a railroad company under its general license to build a railroad, and without any specific grant by the legislative authority to obstruct the highway or waterway, the railroad company is bound to make and keep its crossing, at its own expense, in such condition as shall meet all the reasonable requirements of the public as the changed conditions and increased use may demand." The court said that the implied authority of the company to build its present bridge was coupled with its common law duty" to build its bridge over the natural watercourse, with a view of the future as well as the present contingencies and requirements of such watercourse, and with the further implied provision that there remained in the State, whenever the public welfare required it, the right to regulate its use." Still further: "The subject [the draining of lands] was deemed of such importance that the people, by section 31 of Article IV of the Constitution of 1870, conferred upon the General Assembly plenary powers in making provision for drainage for agricultural and sanitary purposes, and pursuant to that power the General Assembly passed the act under which the appellees are proceeding, declaring that the organization should be for agricultural and sanitary purposes. The Drainage Districts organized, as are the appellees, under that law are invested with the right of eminent domain and the power of taxation, upon the theory that they are public utilities and are held to be quasi public corporations. In their organic character *588 they do not represent merely the individual property owners or themselves, but they represent the State in carrying out its policy, as found in the common law and declared by its constitution and statutes. It has been so often said that it need only be adverted to here, that corporations such as appellant do not hold their property and exercise their franchises strictly in a private right, but that from the nature of their business and their relation to society they are public corporations in a sense and are subject to public control and regulation, though with their grant of power to traverse the State with their lines of railroad it cannot be said that their right of private property attaches to every highway and watercourse over which their roads may be constructed. To so hold would render such enterprises, which are designed for the benefit of the State, obstacles to its progress and a menace to its general welfare. . . . Of course, in the exercise of the right of the public interest, as against such corporations, the demand must be reasonable and must clearly appear to be for the public welfare. In this case it is not questioned that the improvement of Rob Roy Creek, as proposed, is necessary for the proper drainage of the lands comprising the Drainage District. The petition alleges that such enlargement is necessary and that the same cannot be carried on with the obstructions placed in the bed of said creek by appellant. This the appellant does not deny." C.B. & Q. Ry. Co. v. The People, 212 Illinois, 109, 110, 111, 114, 118.
In Ohio & Miss. R.R. Co. v. McClelland, 25 Illinois, 140, 144, it was said  indeed, all the cases hold  that "the power to enact police regulations operates upon all alike;" that that "power is incident to and part of government itself, and need not be expressly reserved, when it grants rights or property to individuals or corporate bodies, as they take subservient to that right."
A case quite in point is that of Kankakee & Seneca R.R. Co. v. Horan, 131 Illinois, 288. That was an action against a railroad company to recover for damage from the backing of water upon plaintiff's land by reason of an insufficient culvert constructed *589 by it for the passage of water from a certain natural watercourse. The contention of the company was that the culvert when constructed was sufficient for the flow of water at the time, and that it was not bound to make such provision as was necessary for an increase of water in the slough subsequently arising from the drainage into it of the lands along its course. Upon this point the Supreme Court of Illinois said: "We do not subscribe to this doctrine. The Parker slough was a watercourse, and it was the legal right of any one along its line for miles above the railroad, where the water naturally shed toward the slough, to drain into it, and no one below, owning land along the slough, would have any legal remedy against such person so draining the water into the slough above him, for any damage done to his inheritance by means of an increased flow of water caused thereby. In other words, the slough was a legal watercourse for the drainage of all the land the natural tendency of which was to cast its surplus water, caused by the falling of rain and snow into it; and this, whether the flow was increased by artificial means or not. It would seem legitimately to follow that the railroad company, in providing a passageway for the slough, was bound to anticipate and provide for any such legal increase of the waterflow. If it did not, it was doing a wrong and legal injury to any one situated like the appellee, who received injury in consequence of a failure on its part to do its duty." See also the following Illinois cases: People v. Chicago & Alton R.R., 67 Illinois, 118; Chicago, Rock Island & Pacific R.R. Co. v. Moffit, 75 Illinois, 524; Chicago & Northwestern Ry. Co. v. City of Chicago, 140 Illinois, 309; Ohio & Miss. Ry. Co. v. Thillman, 143 Illinois, 127; Frazer v. City of Chicago, 186 Illinois, 480, 486.
Many cases in other courts are to the same general effect. They negative the suggestion of the railway company that the adequacy of its bridge and the opening under it for passing the water of the creek at the time the bridge was constructed determines its obligations to the public at all subsequent periods. In Cooke v. Boston & Lowell R.R., 133 Massachusetts, 185, 188, *590 it appeared that a railroad company had statutory authority to cross a certain highway with its road. The statute provided that if the railroad crossed any highway it should be so constructed as not to impede or obstruct the safe and convenient use of the highway. And one of the contentions of the company was that the statute limited its duty and obligation to provide for the wants of travelers at the time it exercised the privilege granted to it. The court said: "The Legislature intended to provide against any obstruction of the safe and convenient use of the highway, for all time; and if, by the increase of population in the neighborhood, or by an increasing use of the highway, the crossing which at the outset was adequate is no longer so, it is the duty of the railroad corporation to make such alteration as will meet the present needs of the public who have occasion to use the highway." In Lake Erie & Western R.R. Co. v. Cluggish, 143 Indiana, 347, the court said (quoting from Lake Erie & Western R.R. Co. v. Smith, 61 Fed. Rep. 885): "The duty of a railroad to restore a stream or highway which is crossed by the line of its road is a continuing duty; and if, by the increase of population or other causes, the crossing becomes inadequate to meet the new and altered conditions of the country, it is the duty of the railroad to make such alterations as will meet the present needs of the public." So, in State of Indiana v. Lake Erie & Western R.R. Co., 83 Fed. Rep. 284, 287, which was the case of an overhead crossing lawfully constructed on one of the streets of a city, the court said: "If, by the growth of population or otherwise, the crossing has become inadequate to meet the present needs of the public, it is the duty of the railroad company to remedy the defect by restoring the crossing so that it will not unnecessarily impair the usefulness of the highway."
The cases to which we have referred are in accord with the declarations of this court in the recent case of New Orleans Gas Light Co. v. Drainage Commission, 197 U.S. 453. That case would seem to be decisive of the question before us. It there appeared that a gas company had acquired an exclusive right *591 to supply gas to the city of New Orleans and its inhabitants through pipes and mains laid in the streets. In the exercise of that right it had laid its pipes in the streets. Subsequently a Drainage Commission, proceeding under statutory authority, devised a system of drainage for the city, and in the execution of its plans it became necessary to change the location in some places of the mains and pipes laid by the gas company. The contention of that company was that it could not be required, at its own cost, to shift its pipes and mains so as to accommodate the drainage system; that to require it to do so would be a taking of its property for public use without compensation, in violation of the Constitution of the United States. This court said: "The gas company did not acquire any specific location in the streets; it was content with the general right to use them, and when it located its pipes it was at the risk that they might be, at some future time, disturbed, when the State might require, for a necessary public use, that changes in location be made. . .. There is nothing in the grant to the gas company, even if it could legally be done, undertaking to limit the right of the State to establish a system of drainage in the streets. We think whatever right the gas company acquired was subject, in so far as the location of its pipes was concerned, to such further regulations as might be required in the interest of the public health and welfare. These views are amply sustained by the authorities. National Water Works Co. v. City of Kansas, 28 Fed. Rep. 921, in which the opinion was delivered by Mr. Justice Brewer, then Circuit Judge; Gas Light & Coke Co. v. Columbus, 50 Ohio St. 65; Jamaica Pond Aqueduct Co. v. Brookline, 121 Massachusetts, 5; In re Deering, 93 N.Y. 361; Chicago, Burlington & Q.R.R. Co. v. Chicago, 166 U.S. 226, 254. In the latter case it was held that uncompensated obedience to a regulation enacted for the public safety under the police power of the State was not taking property without due compensation. In our view, that is all there is to this case. The gas company, by its grant from the city, acquired no exclusive right to the location of its pipes in the streets, as chosen *592 by it, under a general grant of authority to use the streets. The city made no contract that the gas company should not be disturbed in the location chosen. In the exercise of the police power of the State, for a purpose highly necessary in the promotion of the public health, it has become necessary to change the location of the pipes of the gas company so as to accommodate them to the new public work. In complying with this requirement at its own expense none of the property of the gas company has been taken, and the injury sustained is damnum absque injuria."
The learned counsel for the railway company seem to think that the adjudications relating to the police power of the State to protect the public health, the public morals and the public safety are not applicable, in principle, to cases where the police power is exerted for the general well-being of the community apart from any question of the public health, the public morals or the public safety. Hence, he presses the thought that the petition in this case does not, in words, suggest that the drainage in question has anything to do with the health of the Drainage District, but only avers that the system of drainage adopted by the Commissioners will reclaim the lands of the District and make them tillable or fit for cultivation. We cannot assent to the view expressed by counsel. We hold that the police power of a State embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals or the public safety. Lake Shore & Mich. South. Ry. v. Ohio, 173 U.S. 285, 292; Gilman v. Philadelphia, 3 Wall. 713, 729; Pound v. Turck, 95 U.S. 459, 464; Railroad Co. v. Husen, 95 U.S. 470. And the validity of a police regulation, whether established directly by the State or by some public body acting under its sanction, must depend upon the circumstances of each case and the character of the regulation, whether arbitrary or reasonable and whether really designed to accomplish a legitimate public purpose. Private property cannot be taken without compensation for public use under a police regulation relating *593 strictly to the public health, the public morals or the public safety, any more than under a police regulation having no relation to such matters; but only to the general welfare. The foundations upon which the power rests are in every case the same. This power, as said in Village of Carthage v. Frederick, 122 N.Y. 268, has always been exercised by municipal corporations, "by making regulations to preserve order, to promote freedom of communication and to facilitate the transaction of business in crowded communities. Compensation has never been a condition of its exercise, even when attended with inconvenience or peculiar loss, as each member of a community is presumed to be benefited by that which promotes the general welfare." The constitutional requirement of due process of law, which embraces compensation for private property taken for public use, applies in every case of the exertion of governmental power. If in the execution of any power, no matter what it is, the Government, Federal or state, finds it necessary to take private property for public use, it must obey the constitutional injunction to make or secure just compensation to the owner. Cherokee Nation v. Southern Kansas Railway, 135 U.S. 641, 659; Sweet v. Rechel, 159 U.S. 380, 399, 402; Monongahela Nav. Co. v. United States, 148 U.S. 312, 336; United States v. Lynah, 188 U.S. 445. If the means employed have no real, substantial relation to public objects which government may legally accomplish; if they are arbitrary and unreasonable, beyond the necessities of the case, the judiciary will disregard mere forms and interfere for the protection of rights injuriously affected by such illegal action. The authority of the courts to interfere in such cases is beyond all doubt. Minnesota v. Barber, 136 U.S. 313, 320. Upon the general subject there is no real conflict among the adjudged cases. Whatever conflict there is arises upon the question whether there has been or will be in the particular case, within the true meaning of the Constitution, a "taking" of private property for public use. If the injury complained of is only incidental to the legitimate exercise of governmental powers for the public good, then there is *594 no taking of property for the public use, and a right to compensation, on account of such injury, does not attach under the Constitution. Such is the present case. There are, unquestionably, limitations upon the exercise of the police power which cannot, under any circumstances, be ignored. But the clause prohibiting the taking of private property without compensation "is not intended as a limitation of the exercise of those police powers which are necessary to the tranquility of every well-ordered community, nor of that general power over private property which is necessary for the orderly existence of all governments. It has always been held that the legislature may make police regulations, although they may interfere with the full enjoyment of private property and though no compensation is given." Sedgwick's Stat. & Const. Law, 434.
It remains to deal with a particular aspect of the case. The opening under the present bridge, we assume from the record, was sufficient, when the bridge was constructed, to pass all the water naturally flowing in the creek from lands in that locality. It is sufficient if the channel of the river be left as it is now. The Commissioners demand, however, as they may rightfully do in the public interest, a larger, deeper and wider channel in order to accommodate the increased volume of water in the creek that will come from the proposed plan of the Commissioners. But that is a matter which concerns the public, not the railway company. The duty of the company will end when it removes the obstructions which it has placed in the way of enlarging, deepening and widening of the channel. It follows, upon principles of justice, that while the expense attendant upon the removal of the present bridge and culvert and the timbers and stones placed by the company in the creek, as well as the expense of the erection of any new bridge which the company may elect to construct in order to conform to the plan of the Commissioners, should be borne by the railway company, the expense attendant merely upon the removal of soil in order to enlarge, deepen and widen the channel must be borne by the District. The expense to be borne by the District and the railway *595 company, respectively, can be ascertained by the state court in some appropriate way, and such orders made as will be necessary to facilitate the execution of the plan of the Commissioners.
Without further discussion we hold it to be the duty of the railway company, at its own expense, to remove from the creek the present bridge, culvert, timbers and stones placed there by it, and also (unless it abandons or surrenders its right to cross the creek at or in the vicinity of the present crossing) to erect at its own expense and maintain a new bridge for crossing that will conform to the regulations established by the Drainage Commissioners, under the authority of the State; and such a requirement if enforced will not amount to a taking of private property for public use within the meaning of the Constitution, nor to a denial of the equal protection of the laws.
Leaving it to the state court to give effect to these views by appropriate orders and subject to the above qualifications, the decree of the state court is
Affirmed.
MR. JUSTICE HOLMES, with whom agreed MR. JUSTICE WHITE and MR. JUSTICE McKENNA, concurring.
I concur in the main with the judgment of the court. I agree that the public authority has a right to widen or deepen a channel if it sees fit, and that any cost that the railroad is put to in rebuilding a bridge the railroad must bear. But the public must pay for the widening or deepening, and I think that it does not matter whether what it has to remove is the original earth or some other substance lawfully put in the place of the original earth. Very likely in this case the distinction is of little importance, but it may be hereafter. I suppose it to be plain, as my brother Brewer says, that, if an expense is thrown upon the railroad unlawfully, its property is taken for public use without due compensation. Woodward v. Central Vermont Railway Co., 180 Massachusetts, 599.
*596 I am authorized to say that my brothers. WHITE and McKENNA agree with my view.
MR. JUSTICE BREWER, dissenting.
The question in this case is a narrow one, yet of profound importance, and, involving, as in my judgment it does, a grievous wrong to owners of private property, I am constrained to dissent. Conceding the regularity of the proceedings and the power of the State to drain the lands in the Drainage District, and if necessary therefor to compel the building of a new and enlarged bridge over Rob Roy Creek, I dissent from the conclusion that the State may cast the entire cost of such rebuilding upon the railroad company.
It appears from the petition which was demurred to, and whose allegations of fact must therefore be taken as true, that the Drainage District consists of about 2,000 acres on both sides of Rob Roy Creek; that a majority of the lands of said Drainage District are swamp or slough lands, and under natural conditions not subject to cultivation, but by drainage will all be greatly improved and made good tillable lands. The railroad company has for forty years maintained a bridge or culvert over Rob Roy Creek which has answered and does answer all its purposes and necessities. The cost of the ditches and drains in the Drainage District in accordance with the plans adopted by the Commissioners is estimated at $20,000. The railroad bridge or culvert across the creek does not exceed in value $8,000, and a new bridge or culvert can be constructed at a cost of not exceeding $13,000. The drainage act provides for an appraisement of the damages done to any tract by the construction of the proposed work, and a judgment in favor of the owner against the Commissioners of the District for that amount. It also provides for an assessment of the benefits to the different tracts, upon the basis of which assessments taxes are to be levied to pay for the construction and maintenance of the drainage system. In other words, any damage done to *597 any particular tract by the construction of the drainage system is to be paid to the owner of that tract, if a private individual, and the tracts which are benefited are to be charged with the cost in proportion to the amount of benefit received. Section 40 1/2 of the drainage act then provides:
"The Commissioners shall have the power and are required to make all necessary bridges and culverts along or across any public highway or railroad which may be deemed necessary for the use or protection of the work, and the cost of the same shall be paid out of the road and bridge tax, or by the railroad company, as the case may be: Provided, however, notice shall first be given to the road or railroad authorities to build or construct such bridge or culvert, and they shall have thirty days in which to build or construct the same; such bridges or culverts shall, in all cases, be constructed so as not to interfere with the free flow of water through the drains of the district. Should any railroad company refuse or neglect to build or construct any bridge or culvert as herein required, the Commissioners constructing the same may recover the cost and expenses therefor in a suit against said company before any justice of the peace or any court having jurisdiction, and reasonable attorney's fees may be recovered as part of the cost. The proper authorities of any public road or railroad shall have the right of appeal the same as provided for individual land owners."
According to this, if any bridge or culvert on any public highway is needed in order to perfect the drainage system, the cost of it is to be paid out of the public funds; but if a bridge or culvert is required on a railroad, the cost of it must be paid by the railroad company. And this is arbitrary, without any appraisement of benefits or damages.
Now, the property of a railroad company is private property. It cannot be taken for public uses without just compensation. True, it is used by the owners in performing the quasi public work of transportation, but it is not given up to public uses generally. It is not devoted to education or the improvement of farm lands, or, indeed, any other use than that of transportation. *598 If taken therefrom and devoted to other public uses it is the taking of private property for public uses. That this can be done may be conceded, but only upon just compensation.
When private property is taken for public uses compensation must be paid. That is the mandate of the Federal Constitution and of that of nearly every State in the Union. Independently of such mandate, compensation would be required. In 2 Kent, p. 339 (12th. ed.), it is said:
"A provision for compensation is a necessary attendant on the due and constitutional exercise of the power of the lawgiver to deprive an individual of his property without his consent; and this principle in American constitutional jurisprudence is founded in natural equity, and is laid down by jurists as an acknowledged principle of universal law." See also cases cited in the note; especially Gardner v. Village of Newburgh, 2 Johns. Ch. 162, 166.
In Sinnickson v. Johnsons, 17 N.J.L. (2 Harr.) 129, 145, referred to approvingly by this court in Pumpelly v. Green Bay Company, 13 Wall. 166, 178, and Monongahela Navigation Company v. United States, 148 U.S. 312, 324, it was said:
"This power to take private property reaches back of all constitutional provisions; and it seems to have been considered a settled principle of universal law that the right to compensation is an incident to the exercise of that power: that the one is so inseparably connected with the other, that they may be said to exist not as separate and distinct principles, but as parts of one and the same principle."
If this be true when the taking is for that which is solely a public use, how much more true is it when the taking is largely for the benefit of private individuals, and at best only incidentally for the benefit of the public? Now the sole purpose of this proceeding, as admitted by the demurrer, was the transformation of these swamp and untillable lands into good tillable lands; in other words, to that extent, increasing the value of the farms in the hands of their private owners. While the statute *599 under which these proceedings were had contemplates drainage for agricultural and sanitary purposes, there is nothing in this record to show that any sanitary result was contemplated, and the only object disclosed is the direct beneficial result to the owners of these swamp lands. There is not the slightest intimation that the health, morals, or safety of the community will be promoted, or is intended to be promoted, by the drainage. I quote the exact language of the petition:
"And the petitioners aver that the aforesaid location of the ditch or drain along the said Rob Roy Creek was for the purpose of enlarging the channel or watercourse of the aforesaid Rob Roy Creek, and thereby enabling the land in said drainage district to be better drained and render the soil in said district more tillable.

* * * * * * * *
"And your petitioners aver that a majority of the lands of said Drainage District are what is known as swamp or slough land, and under the present condition are not subject to cultivation, but by means of the proposed deepening and enlarging of said Rob Roy Creek, as herein described, and as a result of the removal of said timbers and stones in said Rob Roy Creek, at the place aforesaid, and of the enlargement of and deepening of said Rob Roy Creek, all of the lands in said Drainage District will be greatly improved, and made good, tillable land subject to cultivation."
If it be a principle of natural justice that private property shall not be taken for public purposes without just compensation, is it not equally a principle of natural justice that no man shall be compelled to pay out money for the benefit of the public without any reciprocal compensation? What difference in equity does it make whether a piece of land is taken for public uses or so many dollars for like purposes? Cary Library v. Bliss, 151 Massachusetts, 364, 378, 379; Woodward v. Central Vermont Railway Company, 180 Massachusetts, 599, 603.
But it is said that this is done under the police power of the State, and that that can be exercised without any provision for *600 compensation. It seems to me that the police power has become the refuge of every grievous wrong upon private property. Whenever any unjust burden is cast upon the owner of private property which cannot be supported under the power of eminent domain or that of taxation, it is referred to the police power. But no exercise of the police power can disregard the constitutional guarantees in respect to the taking of private property, due process and equal protection, nor should it override the demands of natural justice. The question in the case is not how far the State may go in compelling a railroad company to expend money in increasing its facilities for transportation, but how far it can go in charging upon the company the cost of improving farms along the line of its road.
Again, it will be perceived that by the section quoted, if, in consequence of the drainage, a bridge or culvert is required on any public highway its cost is paid out of the public funds, but whenever a bridge or culvert is required along or across a railroad the company is charged with the cost. In the one case the public pays and in the other a private owner. It is not pretended that the railway is in any way benefited by the drainage. Its property is not improved, its revenues are not increased. The reconstruction of the bridge or culvert is not needed by it in its work of transportation. It has used its present bridge for over forty years, meeting in that time all the demands of the public for transportation. So that, receiving no benefit, it is charged with the cost of reconstruction, about $13,000, in order to improve the value of the lands belonging to private owners in this Drainage District, when if a highway crossed at the same place and a new bridge or culvert was required the cost of it would be paid out of the public funds. I cannot conceive how this can be looked upon as "the equal protection of the laws."
Further, even under the conclusion reached by the court, the plaintiff in error should recover its costs and, in accord with the common practice in this court, the order should be that the judgment be reversed and the case remanded for further proceedings *601 not inconsistent with our opinion. Stanley v. Schwalby, 162 U.S. 255, 282. Why should it be compelled to pay two or three hundred dollars in costs when it has shown that the decision below placed an improper charge upon it, the amount of which is not disclosed and which may be a very substantial sum?
I am, therefore, constrained to dissent from both the opinion and judgment.