## In re METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION.

**This document relates to:**

**Quincy Community Services District v. Atlantic Richfield Co., et al., 04 Civ. 4970(SAS).**

**No. 1:00–1898, No. MDL 1358(SAS), M21–88.**

United States District Court, S.D. New York.

Nov. 7, 2007.

---

**76.** *Pierpoint v. Barnes,* 94 F.3d 813, 818 (2d Cir.1996).

**77.** *Id.* (emphasis in original).

Robin Greenwald, Esq., Robert Gordon, Esq., Weitz & Luxenberg, P.C., New York City, for Plaintiffs.

Peter John Sacripanti, Esq., James A. Pardo, Esq., McDermott Will & Emery LLP, New York City, for Defendants.

Victor M. Sher, Esq. Richard M. Franco, Esq. Sher Leff LP, San Francisco, CA, for Plaintiff Quincy Community Services District.

Richard E. Wallace, Esq., Peter C. Condron, Esq., Steven C. Dubuc, Esq., Wallace King Domike & Reiskin, PLLC, Washington, D.C., for Defendants Chevron U.S.A., Inc., Equilon Enterprises LLC, Shell Oil Company, and TMR Company and on behalf of the Defendants listed in the Opposition of Certain Defendants to Plaintiff's Motion to Remand.

## OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

"Celebrated as the best example of democracy, cursed as the worst form of fragmented government, and generally misunderstood even by the experts, special districts are California's unique contribution to local government."[1] The first special district was organized by farmers frustrated with an inconsistent water supply and widely fluctuating prices in San Joaquin Valley.[2] Under California's Wright Act of 1887, these farmers were allowed to "create irrigation districts that could raise taxes to build needed canals and diversion structures."[3]

Today, there are over thirty thousand special districts across the country including the Californian plaintiff in this action, Quincy Community Services District ("Quincy").[4] "Special districts deliver highly diverse services including water, closed captioned television, mosquito abatement, and fire protection."[5] "Dis-

---

1. California Senate, Local Government Committee, "What's So Special About Special Districts: A Citizen's Guide to Special Districts in California" at 1 (3d ed. 2002) ("Guide to Special Districts").

2. *See id.* at 4.

3. Norris Hundley, Jr., "The Great American Desert Transformed: aridity, exploitation, and imperialism in the making of the American West" in Mohamed T. El–Ashry & Diana C. Gibbons, *Water and Arid Lands of the Western United States* 21, 32 (1988). "Subsequently, over 50 irrigation districts were cre-

ated in the next 20 years to deal with the problems of financing such projects." Brian P. Janiskee, "The Problem of Local Government in California," *NEXUS: J. Opinion* 219, 227 (citing League of Women Voters of California, "Guide to California Government" at 149 (1992)).

4. There are 35,052 special districts in the country, according to the 2002 Census of Governments. *See* http://www.census.gov/govs/www/gid2002.html.

5. Guide to Special Districts at 2.

tricts' service areas can range from a single city block to vast areas which cross city and county lines."[6]

In this case, Quincy "owns and operates a public drinking water system that supplies water to residential and business users within its service area."[7] Four years ago, Quincy sued various oil companies as a result of the contamination, or threatened contamination, of its groundwater with methyl tertiary butyl ether ("MTBE"). Defendants removed the action from state to federal court and, in mid-2004, it was transferred to this Court as part of a large multi-district litigation ("MDL").

Quincy now moves to remand the action to state court in light of the Second Circuit's decision in *People of State of California v. Atlantic Richfield Company, et al.* and *State of New Hampshire v. Amerada Hess Corporation, et al.*[8] Quincy argues that it is in the same position as the states of California and New Hampshire (*i.e.*, that they are all governmental units enforcing their police or regulatory power) and thus should not have been removed under the bankruptcy removal statute.[9]

Quincy's argument must be rejected for the simple reason that, as a special district under California law, Quincy does not have any police or regulatory powers. Moreover, to the extent that Quincy urges that this Court should exercise its discretion to

abstain from exercising jurisdiction, the Court continues to adhere to the position stated over three years ago when it first considered this issue: retaining federal jurisdiction over the action as part of the MDL better serves the goal of judicial efficiency.[10]

## II. PROCEDURAL BACKGROUND

On November 7, 2003, Quincy filed a complaint in the Superior Court of California, Sacramento County, against various oil companies as a result of the contamination, or threatened contamination, of their groundwater with MTBE. On December 17, 2003, Defendants removed the action to the United States District Court for the Eastern District of California based on, *inter alia*, (1) federal agent jurisdiction, and (2) bankruptcy jurisdiction.[11] Five days later, on December 22, 2003, Quincy filed a motion to remand. The district judge denied Quincy's remand motion and granted a motion to stay the action pending transfer of the case to this Court by the Judicial Panel on Multidistrict Litigation ("JPML"). On a motion to reconsider, however, the judge vacated his order denying the motion for remand, acknowledging that it was not considered on its merits, but ordered that the action remain stayed pending a final order by the JPML.

The JPML then transferred the action to this Court pursuant to section 1407 of

---

6. *Id.*

7. First Amended Complaint ¶ 4 in *Quincy Community Servs. Dist. v. Atlantic Richfield Co., et al.*, 04 Civ. 4970 ("Compl.").

8. *See In re MTBE Prods. Liab. Litig.* ("*In re MTBE*"), 488 F.3d 112 (2d Cir.2007).

9. *See* 28 U.S.C. § 1452 ("section 1452") (authorizing removal of bankruptcy cases). "The following Defendants join in [their] Opposition [to Quincy's motion]: Chevron U.S.A., Inc., CITGO Petroleum Corporation, Coastcal Chem, Inc., Equilon Enterprises LLC, Equiva Services, LLC, Shell Oil Company, Texaco

Inc., and TMR Company." Opposition of Certain Defendants to Plaintiff's Motion to Remand at 1 n. 1.

10. *See In re MTBE*, 341 F.Supp.2d 386, 414–16 (S.D.N.Y.2004).

11. Defendants also removed on the basis of substantial federal question and complete preemption. *See* Notice of Removal, Ex. 1 to Plaintiff's Motion for Remand and Memorandum of Law in Support of Plaintiff's Motion for Remand ("Pl.Mem.").

title 28 of the United States Code as part of a large MDL involving MTBE that now involves over one hundred cases from across the country. The final transfer order was issued on June 16, 2004. Within the thirty day limit for filing a motion to remand, Quincy joined with plaintiffs from California in several other actions in the MDL to move for remand on July 15, 2004. In effect, the July 15, 2004 motion renewed Quincy's original motion for remand made in the Eastern District of California. In the July 15 motion, plaintiffs argued that 28 U.S.C. § 1442 ("section 1442"), the federal officer removal statute, was not a proper basis for removing the actions to federal court or, if this Court held otherwise, it should certify the opinion for review by the Second Circuit under 28 U.S.C. § 1292(b).[12]

In response to the motions to remand filed by various plaintiffs in the MDL, I issued the following orders. In nine actions, plaintiffs from New York filed a motion to remand their cases, which I denied on March 16, 2004.[13] In particular, I held that defendants could remove the action under the federal officer removal statute. I held, among other things, that defendants had sufficiently alleged that they added MTBE to gasoline at the direction of the Environmental Protection Agency, a federal agency, to comply with the requirements of the Reformulated Gasoline ("RFG") Program and the Oxygenated Fuels ("OF") Program.

I then considered the motions to remand filed by twenty-one plaintiffs in non-RFG and non-OF areas of the country, including Quincy.[14] In denying these remand motions on September 3, 2004, I held that this Court had bankruptcy jurisdiction under 28 U.S.C. § 1334 ("section 1334"), because defendant Texaco, Inc. (now ChevronTexaco Corp.) had earlier filed for and been discharged from bankruptcy.[15] Thus, defendants had properly removed the action to federal court under section 1452, the bankruptcy removal statute.

Finally, I considered the motions to remand by the states of California and New Hampshire, which argued that the Eleventh Amendment of the United States Constitution prohibited their actions from being removed to federal court under the doctrine of sovereign immunity.[16] These plaintiffs also argued that their cases were improperly removed under the statutes governing the removal of cases involving federal officers or bankruptcy. I held that "the removal of cases filed by State Plaintiffs does not violate principles of sovereign immunity." [17]

The states of California and New Hampshire appealed that decision to United States Court of Appeals for the Second Circuit. The court affirmed this Court on the first issue, holding that "sovereign immunity does not preclude the removal to federal court of a suit filed by a state plaintiff in state court." [18]

---

12. Thus, Quincy's current motion to remand is untimely because "[a] motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days...." 28 U.S.C. § 1447(c) ("section 1447"). Indeed, in its first motion to remand, Quincy did not argue that its action had been improperly removed under the bankruptcy removal statute. Thus, even in the absence of the strict deadline imposed by section 1447, Quincy's argument would have been waived.

13. *See In re MTBE*, 342 F.Supp.2d 147, 156–58 (S.D.N.Y.2004).

14. *See In re MTBE*, 341 F.Supp.2d at 413–14.

15. *See id.*

16. *See In re MTBE*, 361 F.Supp.2d 137 (S.D.N.Y.2004).

17. *Id.* at 148.

18. *In re MTBE*, 488 F.3d at 119.

The Second Circuit then turned to the question of "whether the removal of these cases has, in fact, been authorized by Congress." [19] The court recognized that "the denial of a motion to remand is generally not the proper subject of an interlocutory appeal." [20] "Nevertheless, California and New Hampshire [asked the Second Circuit] to rule that the district court erred in holding that these cases were removable under the federal officer and bankruptcy removal statutes." [21]

The Second Circuit held that the interlocutory appeal by California and New Hampshire on the issue of sovereign immunity presented a unique situation allowing it to review whether jurisdiction was proper because the issues were "inextricably intertwined" with sovereign immunity, which was properly before the court pursuant to the collateral order doctrine. The Second Circuit held that those two actions had been improperly removed under both the federal officer removal statute and the bankruptcy removal statute.[22] The Second Circuit therefore vacated this Court's order and remanded with directions to re-

turn the cases to the forums from which they were removed.

Following the Second Circuit's decision, Quincy filed this new motion to remand. Quincy argues that the removal of its action under the bankruptcy removal statute was improper and thus the case should be remanded or the Court should exercise its discretion and abstain from continuing to exercise jurisdiction.[23]

## III. DISCUSSION

Quincy's primary argument is that "[u]nder the Second Circuit's holding in the *People of California* and *New Hampshire* cases, Plaintiff's lawsuit comes squarely under the public agency exception to the bankruptcy removal statute." [24] However, unlike the states of California and New Hampshire, Quincy does not have any police or regulatory powers. Thus, as a matter of law, it is impossible for Quincy to file a civil action to enforce such power. In addition, Quincy also argues that this Court should exercise its discretion to remand the action. The Court declines to exercise its discretion because the reasons

19. *Id.* at 121.

20. *Id.* (citing 28 U.S.C. § 1291).

21. *Id.*

22. *See id.* at 136 ("Because the requirements of the applicable removal statutes have not been met, we vacate the order of the district court and remand with directions to return these cases to the forums from which they were removed."). In one of this Court's decisions cited and discussed by the Second Circuit, I held that this Court had core bankruptcy jurisdiction over the action. *See In re MTBE,* 341 F.Supp.2d at 414. The Second Circuit's opinion did not challenge this holding even though it was an issue the appellate court had an independent duty to analyze and determine if it had any doubt. *See* Fed. R.Civ.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."). *See also*

*Kontrick v. Ryan,* 540 U.S. 443, 455, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004).

23. The Court and the parties agree that this Court lacks jurisdiction under section 1442, the federal officer removal statute. When the Second Circuit held that removal was improper under section 1442, it necessarily held that this Court lacked jurisdiction because there is no independent statute that gives original subject matter jurisdiction to federal courts over cases involving federal officers. "Federal jurisdiction rests on a 'federal interest in the matter,' the very basic interest in the enforcement of federal law through federal officials." *Willingham v. Morgan,* 395 U.S. 402, 406, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969) (quoting *Poss v. Lieberman,* 299 F.2d 358, 359 (2d Cir.1962)).

24. Pl. Mem. at 5.

for retaining the action as part of this MDL that this Court gave several years ago still apply today.

## A. DEFENDANTS PROPERLY RE-MOVED THE ACTION UNDER SECTION 1452

■ The bankruptcy removal statute provides:

> A party may remove any claim or cause of action in a civil action other than . . . a civil action by a governmental unit *to enforce such governmental unit's police or regulatory power*, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.[25]

Section 1334 provides district courts with "original and exclusive jurisdiction of all cases under title 11" and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."[26] Under the plain language of the statute, an action may be removed to federal court if the court has bankruptcy jurisdiction under section 1334 unless it is a civil action by (1) a governmental unit that is (2) enforcing its police or regulatory power.[27]

### 1. A Service District Is a Governmental Unit Under California Law

■ The Bankruptcy Code defines a "governmental unit" as including an "agency . . . of . . . a State."[28] Under California law:

> "Special district" means any agency of the state for the local performance of governmental or proprietary functions within limited boundaries. "Special district" includes a county service area, a maintenance district or area, an improvement district or improvement zone, or any other zone or area formed for the purpose of designating an area within which a property tax rate will be levied to pay for a service or improvement benefitting that area.[29]

Because California law defines a special district as a state agency, Quincy qualifies as a "governmental unit" for purposes of the Bankruptcy Code.[30] Thus, the pivotal question in determining whether Quincy's action was improperly removed is whether Quincy's action enforces its "police or regulatory" powers.

**25.** 28 U.S.C. § 1452 (emphasis added).

**26.** 28 U.S.C. § 1334(a) & (b).

**27.** *See, e.g., United States ex rel. Fullington v. Parkway Hosp., Inc.*, 351 B.R. 280 (E.D.N.Y. 2006) (holding that while qui tam actions by private parties could be "on behalf" of or "for" a "governmental unit," they are not actions "by a governmental unit" as required by the Bankruptcy Code).

**28.** 11 U.S.C. § 101(27). The statute states in pertinent part: "A 'governmental unit' includes the following: United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States . . . a State, a Commonwealth, a District, a Territo-ry, a municipality, or a foreign state; or other foreign or domestic government. . . ." *Id.*

**29.** Cal. Gov't Code § 16271(d).

**30.** *See* Jared Eigerman, "California Counties: Second–Rate Localities or Ready–Made Regional Governments?," 26 *Hastings Const. L.Q.* 621, 670 (1999) ("Eigerman, California Counties") ("California courts give the Legislature free rein over the state's various types of special districts, including: school, irrigation, reclamation, drainage, bridge and highway districts, and redevelopment agencies. *Special districts are always agencies of the State.* As such, their creation and attributes are wholly in the Legislature's discretion.") (emphasis added).

## 2. As a Special District, Quincy Does Not Have Any Police or Regulatory Powers

■ While the Bankruptcy Code does not define the phrase "police and regulatory power," the Supreme Court has long held that police power "embraces *regulations* designed to promote the public convenience or the general prosperity, as well as *regulations* designed to promote the public health, the public morals, or the public safety."[31] In other words, states traditionally have had the power to enact and enforce regulations to protect the health and safety of their citizens, and these regulatory powers are commonly referred to as "police powers."[32]

As the plain language of section 1452 recognizes, a complaint filed by a governmental unit does not always enforce its "police or regulatory" powers.[33] Thus, courts must determine whether a civil action enforces a governmental unit's police or regulatory power or some other power. While courts have employed two tests to make this determination (*i.e.*, the "pecuniary purpose" and the "public policy" test),[34] neither test applies here for a simple reason: as a special district, Quincy lacks any police or regulatory powers. Thus, it is impossible for the action to represent an enforcement of such powers as a matter of law.

According to the California Senate's Local Government Committee:

Special districts have the **corporate power** and **tax power** but rarely the **police power.** The *corporate power* is the ability to "do things," like constructing public works projects such as dams and sewers. It's the power to deliver recreation programs and collect garbage. The *tax power* is the authority to raise money to pay for these projects and services. The *police power* is different; it's the authority to regulate private behavior to accomplish a public goal. Governments that make rules and enforce them use the police powers: zoning property, requiring business licenses, or setting speed limits. Special districts rarely have police powers. Instead, they usually build public facilities and provide services. When special dis-

---

**31.** *Chicago, B. & Q. Ry. Co. v. Illinois*, 200 U.S. 561, 26 S.Ct. 341, 349, 50 L.Ed. 596 (1906) (emphasis added).

**32.** *See, e.g., Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) ("Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens.").

**33.** *See, e.g., Chao v. Hospital Staffing Servs., Inc.*, 270 F.3d 374, 378 (6th Cir.2001) (holding that "the [Secretary of Labor's] suit is not in furtherance of her statutory powers to regulate and enforce labor standards, but rather is designed to and would, if allowed to proceed, promote the private rights of unpaid workers vis-a-vis other creditors of the debtor's estate."); *Corporacion de Servicios Medicos Hospitalarios de Fajardo v. Mora*, 805 F.2d 440 (1st Cir.1986) (holding that a breach of contract action by the Department of Health

for the Commonwealth of Puerto Rico did not qualify as an exercise of police or regulatory power even if related to the Department's general regulatory power); *In re Sampson*, 17 B.R. 528, 531 (Bankr.D.Conn.1982) (holding that the enforcement of a statute against an individual who had been involved in a motor vehicle accident is not an exercise of the state's police or regulatory power if "[t]he state statute is not a highway safety statute designed to keep incompetent drivers off the road").

**34.** These tests were developed based on statements of two of the sponsors of the amendments to the Bankruptcy Code, who explained that the law was intended to be read narrowly to avoid governmental actions seeking to assert pecuniary interests rather than enforcing substantive policy. *See* 124 Cong. Rec. H. 11092, H. 11093 (Sept. 28, 1978); S17409 (Oct. 6, 1978) (remarks of Rep. Edwards and Sen. DeConcini).

tricts do have police powers, they are usually related to some corporate power. Banning alcohol from a park district's picnic area is one example.[35]

Special districts may be considered governmental units in the sense that they can collect revenue and own property but they do not have the full scope of regulatory powers that a government such as the state of California or New Hampshire possesses.

Given that Quincy exercises corporate powers but lacks police powers, it might best be thought of as a "public corporation," a phrase commonly used by courts when describing the first special districts in California, which served the public in a fashion similar to Quincy.[36] In fact, the California State Controller classifies special districts as engaging in either "enterprise activities" or "non-enterprise activities" and the former are "accounted for in a manner similar to a private business."[37] The Controller's report identifies water utilities an example of an "enterprise activity."

> Enterprise activities are accounted for in a manner similar to a private business, such as a water utility. The acquisition, operation, and maintenance of governmental facilities and services are entirely or predominantly self-supporting through user charges or fees.[38]

The fact that Quincy lacks regulatory or police power is made clear by reviewing the law that controls Quincy, the California Community Services District Law ("district law").[39] The district law is narrowly focused on providing the services listed in the statute. Among other things, this law provides that "a district may ... [s]upply water for any beneficial uses, in the same manner as a municipal water district, formed pursuant to the Municipal Water District Law of 1911, Division 20 (commencing with Section 71000) of the Water Code."[40] To raise funds to pay for the services, a community services district such as Quincy is authorized by section 61115 to establish and enforce "rates and charges for services and facilities that the district provides."[41] Thus, Quincy may set and enforce water rates and charges, and it may sue or be sued in a manner akin to a corporation, but it otherwise lacks enforcement or regulatory authority with respect to its water services.

Quincy lacks any power to legislate or pass regulations that affect the public or substantive policy with respect to water. In fact, because "[s]pecial districts rarely have police powers," this Court instructed the parties to submit letter briefs addressing whether Quincy had any police or regulatory powers and to list the statute that provides it with such power.[42] In re-

---

35. Guide to Special Districts at 2 (emphasis in original).

36. *See Tulare Irr. Dist. v. Collins*, 154 Cal. 440, 440, 97 P. 1124 (1908) ("The plaintiff, Tulare Irrigation District, is a public corporation organized under the act of the Legislature approved March 7, 1887, generally known as the 'Wright Act' (St.1887, p. 29, c. 34)."); *Boskowitz v. Thompson*, 144 Cal. 724, 727, 78 P. 290 (1904); *Boehmer v. Big Rock Creek Irr. Dist.*, 117 Cal. 19, 28, 48 P. 908 (1897). *See also* Eigerman, California Counties, 26 *Hastings Const. L.Q.* at 694 ("Although most special districts are 'public corporations' operating only locally, they are all agencies of the State.").

37. California State Controller's Office, "Special Districts Annual Report," at vi (May 10, 2007) attached as Ex. C to 10/11/07 Letter from Responding Defendants in Response to 10/3/07 Order.

38. *Id.*

39. Cal. Gov't Code § 61000 *et seq.*

40. *Id.* § 61100(a).

41. *Id.* § 61115.

42. *See* 10/3/07 Order at 2.

sponse, Quincy merely points to "general powers" given to the district as listed in section 60160 and its right to sue or be sued—a right given to every corporation, public or private. Quincy also points to the power "[t]o adopt, by ordinance, and enforce rules and regulations for the administration, operation, and use and maintenance of the facilities and services listed in Part 3 (commencing with Section 61100)."[43] By the statute's own language, the "regulations" that Quincy may pass apply only to its "facilities and services"—as opposed to regulations that govern or control the public's use of water.

Quincy is not a state environmental agency and it lacks any regulatory power similar to such an organization. For example, Quincy is not allowed to determine the level of contaminants that the water it provides may contain. Nor does the district law impose on Quincy the duty to investigate or remediate its water when it becomes contaminated. In the end, Quincy's only argument is that

> Quincy's action relates primarily to matters of public health and welfare, with the clear goal being to remedy environmental damage and recover cleanup costs associated with MTBE contamination in its water supply. As such, this case fits squarely within 1452(a)'s prohibition on removal of government enforcement actions, and must be remanded.[44]

While I have no doubt that providing water is extremely important to the public, especially in California and other arid regions, this is not a good reason for ignoring the language of section 1452 which provides an exemption from removal only when "a civil action [has been filed] by a governmental unit *to enforce such governmental unit's police or regulatory power.*"[45]

The fact is that over 35,000 special districts have been formed across the country to promote the public welfare in various ways. To accept Quincy's argument would dramatically affect the Bankruptcy Code given that each one of these special districts would not only be allowed to file unremovable actions in state court but also not be subject to the automatic stay imposed by the Bankruptcy Code.[46] "The language of the police and regulatory power exceptions in the automatic stay context and in the removal context is virtually identical, and the purpose behind each exception is the same," and courts interpret them in a identical manner.[47]

The critical role of the automatic stay in a bankruptcy proceeding cannot be overlooked. The filing of a petition under the Bankruptcy Code creates an estate consisting of the debtor's property at the moment of the filing as well as other property recaptured by the estate during the bankruptcy proceeding.[48] This property becomes the "pot" from which all claims against the debtor will be paid pursuant to

43. Cal. Gov't Code § 61060(c).

44. Pl. Mem. at 8.

45. 28 U.S.C. § 1452 (emphasis added).

46. *See* 11 U.S.C. § 362(b)(4) (exempting actions from the automatic stay provision if filed by governmental units to enforce police and regulatory powers).

47. *City & County of San Francisco v. PG & E Corp.*, 433 F.3d 1115, 1123 (9th Cir.2006). *Accord In re MTBE*, 488 F.3d at 132.

48. A party voluntarily enters bankruptcy by filing a petition or, in the alternative, a company's creditors may file a petition to place the company in involuntary bankruptcy. In either event, the petition triggers an automatic stay that halts most proceedings attempting to recover the debtor's assets. *See* 11 U.S.C. § 362.

the Code's priority scheme. The filing of a petition automatically imposes a broad stay on other proceedings against the debtor and its property.[49]

"The automatic stay is a crucial provision of bankruptcy law. It prevents disparate actions against debtors and protects creditors in a manner consistent with the bankruptcy goal of equal treatment by ensuring that no creditor receives more than an equitable share of the bankrupt's estate."[50] The automatic stay was designed to "prevent a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts," and it "insures that the debtor's affairs will be centralized, initially, in a single forum in order to prevent conflicting judgments from different courts and in order to harmonize all of the creditors' interests with one another."[51]

To hold that Quincy's action falls within the exception to the bankruptcy removal statute would also mean that the automatic stay could not be imposed. In essence, every special district in the country formed to promote some aspect of the public welfare would have free rein over a debtor's assets simply because they state that they are enforcing "police or regulatory power"—despite the fact that they generally lack any such authority.

Neither the plain language of the bankruptcy statute, nor the policy underlying it, justifies holding that a special district without any police powers may nonetheless file an action "to enforce such governmental unit's police or regulatory power."[52] Thus, Quincy's action was properly removed.

## B. After Three Years, Abstaining from the Exercise of Jurisdiction Is Unwarranted

█ Three years ago, this Court held that "abstention was not warranted here for several reasons."[53] The first reason was that "remanding the remaining non-RFG cases would result in the duplicative and uneconomical use of judicial resources and the risk of inconsistent judgments."[54] In particular, I noted that "[t]he Court has federal agent jurisdiction over more than forty MTBE cases, and by exercising its bankruptcy jurisdiction, it can best avoid the waste and inconsistency that multidistrict litigation is intended to resolve."[55]

Quincy argues that the Court should now abstain from exercising jurisdiction over this action because "it is uncontested that this Court does not have federal officer jurisdiction over this case."[56] However, given that the Court has federal jurisdiction under bankruptcy law (i.e., section 1334), it remains true that retaining jurisdiction over the action "can best avoid the waste and inconsistency that multi-district litigation is intended to resolve."[57]

While the Second Circuit has determined that this Court does not have federal agent jurisdiction over the actions in this MDL, Quincy fails to give weight to the number of actions over which this Court has jurisdiction for different reasons

---

49. See id. § 362(a).

50. In re Parr Meadows Racing Ass'n, Inc., 880 F.2d 1540, 1545 (2d Cir.1989) (internal citations omitted).

51. In re Fidelity Mortgage Investors, 550 F.2d 47, 55 (2d Cir.1976). See also H.R.Rep. No. 95–595, at 340 (1977).

52. 28 U.S.C. § 1452.

53. In re MTBE, 341 F.Supp.2d at 414.

54. Id. at 414–15.

55. Id. at 415.

56. Plaintiff's Reply Memorandum in Support of Motion for Remand at 2.

57. In re MTBE, 341 F.Supp.2d at 415.

or the effect that remanding its action would have in this litigation. In this MDL, the Court continues to have bankruptcy jurisdiction over forty actions that were removed to federal court. As this Court originally explained:

> [T]he exercise of jurisdiction would promote the efficient administration of Texaco's estate since a bankruptcy court of this district issued the original Confirmation Order. If it were later determined that plaintiffs' claims are pre-petition claims that were not discharged by the Confirmation Order and that ChevronTexaco is liable, plaintiffs may seek leave from this Court to reopen the bankruptcy proceedings.[58]

In addition, plaintiffs have also filed thirty-five actions in federal court, which have been transferred to this Court, on the grounds of diversity, a federal claim under the Toxic Substances Control Act ("TSCA"),[59] or the Energy Policy Act of 2005.[60] Finally, plaintiffs in other actions that were removed and transferred to this Court have also filed properly amended complaints with TSCA claims.[61]

"Every action in the MDL asserts claims arising from one or more defendants' production, distribution, handling, or sale of MTBE-containing gasoline that is alleged to have contaminated plaintiffs' groundwater."[62] Over the last three years, the Court "has issued thirty-six substantive opinions and orders, comprising more than one thousand pages of text; has issued thirty Case Management Orders; and has held over thirty-five status conferences."[63] To remand this action at this stage would not only risk conflicting decisions, but also force the state court to devote substantial judicial resources that are already being expended in federal court. The circumstances of this case do not warrant creating such a risk or imposing such a burden on another court.

## IV. CONCLUSION

For the foregoing reasons, plaintiff's motion to remand the action is denied. The Clerk of the Court is directed to close this motion (docket # 1471).

SO ORDERED.

---

**58.** *Id.*

**59.** *See* 15 U.S.C. § 2607(e).

**60.** *See* Energy Policy Act of 2005, Pub.L. No. 109–58, 119 Stat. 594 (2005).

**61.** *See, e.g., In re MTBE,* at 305–19.

**62.** *Id.* at 300–01.

