physical examination of the plaintiff. The evidence of plaintiff's consumptive condition was competent under the general allegations of the complaint. Ehrgott v. Mayor, 96 N. Y. 264, 48 Am. Rep. 622. It is only where the plaintiff has specifically alleged the injury received and its consequent results that the courts have held him limited to the allegations of his pleading in this respect. Rudomin v. Interurban Street R. Co., 111 App. Div. 548, 98 N. Y. Supp. 506. No request was made to withdraw a juror, nor was the claim that defendant was surprised by the evidence to its prejudice presented to the trial court in any manner other than by an objection to the questions asked, having for their purpose the reception of the evidence referred to. Under such circumstances the contention that a new trial should be directed upon this ground is without merit.

It is urged that under certain conditions of living plaintiff can be cured of the consumption with which he is now afflicted in from one to three or four years, and that the recovery of $9,000 is so excessive as to demand a new trial. It is undisputed that the average weekly earnings of the plaintiff prior to his injury were $40, or over $2,000 a year. In view of this fact, and of his physical condition as disclosed by the evidence, we do not regard the verdict as excessive.

The record discloses no prejudicial errors, and the judgment and order must be affirmed, with costs. All concur.

---

(123 App. Div. 254.)

### NEW YORK STEAM CO. v. FOUNDATION CO.

(Supreme Court, Appellate Division, First Department. January 10, 1908.)

1. MUNICIPAL CORPORATIONS—EXCAVATION IN STREETS—BUILDING REGULATIONS—APPLICATION.

Building Code, § 22, requiring an owner excavating below 10 feet to protect his neighbor's wall, regulates the rights of adjoining owners and occupants of premises, with respect to building operations on one lot, affecting the building, the occupants thereof, and property on an adjacent lot, but has no application to excavations in the public streets.

2. ADJOINING LANDOWNERS—LATERAL SUPPORT.

At common law an owner of land is only entitled to the lateral support of his land against an adjoining owner where the land remains in its natural state and the cohesiveness of the soil has not been disturbed by excavations or structures thereon.

3. MUNICIPAL CORPORATIONS—EXCAVATIONS IN STREETS—STEAM CONDUITS—DAMAGES.

Where a street in which plaintiff's steam conduits had been laid under a previous license from the city had been extensively excavated, and four lines of underground improvement had been placed therein, plaintiff could not recover for damages to such conduit caused by the settling of the ground, due to nonnegligent driving of sheet piling by a contractor in the process of constructing a vault underneath the sidewalk, under a license from the city, to be used in connection with an adjoining building in process of erection.

4. SAME—USE OF STREETS—ABUTTING OWNER—CONSTRUCTION OF VAULTS.

Under Greater New York Charter, Laws 1901, p. 27, c. 466, § 49, subd. 7, authorizing the city to grant the right to an abutting owner to construct vaults underneath the streets, a permit for the construction of a vault in a street for the use of an abutting owner is in the nature of a revocable

private easement, and may be revoked when the space is required for municipal or other public purposes, but, until revoked, may be fully enjoyed.

5. SAME—STEAM CONDUIT IN STREET—RIGHTS OF LICENSEE.

A licensee of the right to construct a steam conduit in a street obtained its right subject to that of the municipal authorities to place other local improvements and to grant vault privileges in the street, though the construction thereof should require the licensee to take additional precautions for the protection of its conduit, or subject it to extra expense in the maintenance thereof; and hence the facts that its license was prior in time, and that it was a public service corporation, did not give it superior rights to those acquired by an abutting property owner under a municipal license authorizing him to construct a vault under the sidewalk adjacent to his property extending to the curb line.

6. SAME—ABUTTING OWNER—METHOD OF CONSTRUCTION OF VAULTS.

Where a permit authorizing the construction of a vault under a sidewalk in a street provided that the wall of the vault should be constructed on the curb line, the contractor was authorized to drive sheet piling in the street outside the curb line to hold the street pending construction of the vault wall.

7. TRESPASS—NATURE OF TRESPASS.

Where plaintiff's steam conduit constructed in a street was injured by the subsidence or vibration of the earth, due to the driving of sheet piling in the street just outside the curb line for the construction of a vault under the sidewalk for the benefit of an abutting landowner, and nothing was thrown on or against plaintiff's construction in the street, a recovery for the injury sustained because of the construction could not be had on the theory of trespass, without negligence.

8. SAME—REAL PROPERTY—VIBRATIONS OF EARTH OR AIR.

In the absence of negligence, there is no liability for consequential damages incidentally resulting from vibrations of the earth or the air caused by the construction of a lawful improvement either in a public street or upon private property.

McLaughlin and Houghton, JJ., dissenting.

Appeal from Judgment on Report of Referee.

Action by the New York Steam Company against the Foundation Company. From a judgment for plaintiff on the decision of a referee, to whom the issues were referred to hear, try, and determine, defendant appeals. Reversed, and new trial granted.

No case and exceptions was made, and the appeal merely brings up the judgment roll for review. The facts, therefore, stand as found by the referee. The only exception is to the second conclusion of law, which authorizes a judgment in favor of the plaintiff for the damages which it has sustained. The material facts found by the referee are that the plaintiff is a domestic corporation duly formed in 1881 by the consolidation of the Steam Heating & Power Company of New York and the New York Steam Company, which were incorporated, respectively, on the 23d day of July, 1879, and the 26th day of July, 1880, pursuant to the provisions of chapter 40, p. 54, of the Laws of 1848, as amended by various acts, including chapter 290, p. 383, of the Laws of 1879, for the purpose, among others, of supplying steam for motive power, heating, cooking, and other applications in the streets and public and private buildings of the city of New York, and succeeded to the property, franchises, rights, and privileges of said companies; that since its incorporation it has been engaged in the business of supplying steam to consumers from central stations through pipes laid in the public streets of the borough of Manhattan, New York; that pursuant to the provisions of chapter 317, p. 401, of the Laws of 1879, the New York Steam Company obtained the consent of the mayor, aldermen, and commonalty of the city of New York to lay its pipes or conductors for conducting hot water, hot air, or steam through the streets, avenues, lanes, alleys, squares, and highways of said city, by a resolution of

the board of aldermen which became effective on the 14th day of December, 1880, and in all respects complied with the conditions of said grant, among which was the condition that it should annually pay into the sinking fund for the benefit of the city the sum of three cents per lineal foot of street in which its pipes or mains were laid; that since the year 1891 the plaintiff, pursuant to said grant, has maintained an iron pipe with the necessary expansion joints, protective brick walls, coverings, and other appurtenances in New street, on the east side thereof, between Wall street and Exchange Place, 8 inches in diameter, connected with its central station at Cortlandt and Dey streets, through which it has supplied steam to consumers on New street and other streets in said borough of Manhattan. The construction placed in said street by the plaintiff is defined in findings 7 to 11, inclusive, as follows:

"Seventh. The said pipe was a steel pipe, 8 inches in diameter, made in lengths of about 20 feet, having cast-iron flanges, with expansion joints every 100 feet, and anchorage points midway between the expansion joints. On either side of the steam pipe, at a distance of 4 inches from the outside of the pipe, was a vertical 8-inch brick wall, which extended about a foot below the bottom of the pipe and about 5 or 6 inches above the pipe. Above the pipe, and spanning the brick walls and the pipe that lay between them, were wooden covers about 3 inches thick. There were two layers of these wood covers, with tar paper on top to keep the moisture from percolating through. Underneath the brick work and the pipe there were about 2 inches of concrete. Between the brick walls, and surrounding the pipe up to the level of the wooden covers is mineral wool, to prevent the radiation of heat. Mineral wool is a nonconducting substance, and is made by blowing a blast of steam through the slag of a blast furnace. The extreme distance from the outside of one of these brick walls to the outside of the other brick wall was 46 inches at the expansion joints, and in other places 32 inches approximately. The extreme vertical dimension of each wall was about 56 inches, including foundations under variator. This brick structure has no rigidity of its own, except as being a mass of masonry.

"Eighth. The expansion joints, which were also known as 'variators,' were a device to take care of the expansion of the pipe when it was heated by the steam—a device to confine the steam and still allow the pipe to expand from the natural expansion caused by the different temperatures to which it was subjected. The outside diameter of the expansion joints was about 31 inches.

"Ninth. Midway between the expansion joints or variators were anchorage points, at which the pipe was braced or anchored to the brick walls; and the clasping of the expansion joints was also clamped to the brick walls. The object of the anchorage points was to keep the pipe midway between the variators, and to allow the pipe to expand into each variator at either side of it equally. It was not the office of the anchorage to prevent unequal sinking of the pipe, or to keep the pipe on the same level, so as not to leak. That office was performed by the piers hereafter described, and the only office of the anchorage was to prevent longitudinal motion. The object of the clamping of the clasping of the expansion joints was to leave the pipe free, at the expansion joints, to move into the clasping. At each anchorage point there was usually a service box, with side outlets about 3 inches in diameter, to which service pipes could be connected. There were also outlets on the outside of the expansion joints for connecting services. Service boxes are merely used to furnish an outlet for taking services off, and they are usually provided on one side with what is termed a 'ball joint,' which allows a change of direction in the main at that point. The service boxes were adopted to supply a building on the line that was not already supplied. It is there that the service pipe would be connected.

"Tenth. Underneath each expansion joint there was a brick pier and sheet iron plate, and under each anchorage point there was a brick pier, and at every length of pipe there was a brick pier, supporting a roller, or saddle, upon which the pipe rolled as it expanded. These piers were about 15 or 16 inches square, and about 1½ feet deep, merely placed in a hole dug beneath the level of the pipe. They were not carried down to the rock, nor did the general pipe structure anywhere rest on rock. The lowermost point to which the plaintiff's pipe structure went, including the piers, was about 10 feet be-

low the surface. Down to that point the soil of the street was a fairly good, compact soil. There is no evidence as to the character of the soil at greater depths.

"Eleventh. The object of the brick walls was to keep the service boxes midway between the variators, so that the pipe could expand equally into the variator from both sides, and by its support of the wooden covers to keep the weight of the street from resting directly on the pipe. The object of the mineral wool was to act as a nonconductor, and it prevented undue waste of heat in the pipe."

The learned referee also found that, in addition to the plaintiff's pipe and appurtenances, there were also in this part of New street a sewer, a Croton water main, a gas main, and a conduit for carrying electric wires; that for some months prior and subsequent to the 1st day of March, 1905, the defendant was engaged in excavating for and constructing the foundation of an addition to the Commercial Cable Company's building on New street, between Wall street and Exchange Place, known as Nos. 24 to 28 New street, having a frontage on the east side of New street of 72 feet 6 inches, including the work of building a vault wall on the curb line on the east side of the street; that in preparation for and in the course of the work it drove and maintained sheet piling, consisting of planks about 4 inches in thickness, in the street immediately outside of the curb line, there being at the time a vault in the street in front of said lots, extending under the sidewalk to the curb line, a distance of about 8½ feet from the building line; that the vault was sunk to the depth of 18 or 20 feet, and the piling was driven to the same depth below the curb, or deeper; that the vaults constructed by the defendant extended to, but not beyond, the curb line, and the total length of the vault from the northerly curb line of Exchange Place, northerly along New street, was 80 feet 8 inches, including the wall; that "the driving and maintaining of said piling by the defendant, and its operations in and about said premises, caused the street in places to settle, causing the said pipe of the plaintiff to bend, break, and leak, and making it necessary that the same and the construction around it should be removed, and that 92 feet of new pipe (including one expansion joint and one service box) and the necessary construction around it should be laid, and that the same should be brought to the original level of the plaintiff's pipe, in the course of which work (which was done as soon as the condition of the street permitted) it was necessary for the plaintiff to open the street and replace the soil, and in and about said work the plaintiff necessarily expended" the sum of $876.83 and was damaged in the sum of $725; that "when the defendant commenced the work of driving its said piling the plaintiff notified it that driving this piling so near plaintiff's pipe would carry down some of plaintiff's construction with it and otherwise endanger the pipe, but defendant replied that said piling had to be driven"; that upon discovering the injury plaintiff notified the defendant thereof, and that it would be necessary to relay or line up the pipe, and that it would hold defendant responsible for the damage; that "during the progress of the work the plaintiff had full knowledge and cognizance of the said work of vault construction by defendant, and of the character of such work, and of the excavation which the defendant was making in the course thereof"; that the fee of New street has been in the city of New York since 1850; that "the defendant was not guilty of any negligence in the construction of said foundation or of said vaults, or in the making or guarding of said excavations, or in the driving or maintaining of said sheet piling, or in the holding up or supporting of the soil of New street lying outside the curb, or in any work or methods of work used by it for the purpose of or in connection with any of said details"; that the brick walls, expansion joints, coverings, and other appurtenances of the plaintiff's pipes are necessary to prevent injury to the public and other structures in the street from the radiation of heat, and to the practical operation of a steam system in the streets of the city; that there are connected with plaintiff's station, with which this pipe was connected, about 5½ miles of main pipe, the greater part of which has been in operation since 1882, now supplying about 550 customers; that it has another similar large station at Fifty-Ninth street and East river; that its pipes have always been laid under the supervision of inspectors appointed by the proper local authorities; that on

the 14th day of July and the 10th day of August, 1904, the Commercial Cable Company, with whom the defendant contracted, obtained permits from the proper local authorities for the construction of these vaults and paid therefor the sum of $460.40 and $385.88, respectively. They each contained a clause as follows: "It is distinctly understood that this permit gives no authority, and it is strictly forbidden, to disturb, by excavation or otherwise, or in any way damage or interfere with the proper use of, any lamp post, sewer, culvert, receiving basin, house drain, water hydrant or stop-cock, or stop-cock chamber or water pipe, or do anything to prevent the proper use of any hydrant or stop-cock, or expose them to freezing, or to disturb or interfere with any subway, gas, or other connections, authorized under permits granted by the commissioner of public works. * * * This permit is issued subject to revocation thereof at any time hereafter by the commissioner of public works, when in his judgment the space occupied by said vault or any portion thereof may be required for any public improvement, or upon any violation of any of the terms or conditions hereof." A former permit for the construction of a vault in front of No. 28 New street, extending as far as the curb, was duly issued on the 13th day of July, 1877, and the sum of $157.50 paid therefor. The referee set forth the provisions of the Building Code in his findings, and, so far as material, they will be alluded to in the opinion.

Argued before PATTERSON, P. J., and McLAUGHLIN, LAUGHLIN, HOUGHTON, and LAMBERT, JJ.

Edwin D. Worcester, for appellant.
James W. Hawes, for respondent.

LAUGHLIN, J. I am unable to agree with all of the views of the learned referee upon the law applicable to the facts found, or with his conclusion. He correctly ruled that section 22 of the Building Code has no bearing on the case. The provisions of that section, like the previous statute from which they were taken, were designed to regulate the rights of the adjacent owners and occupants of premises with respect to building operations upon one lot, affecting the building, the occupants thereof, and property on an adjacent lot (Dorrity v. Rapp, 72 N. Y. 307; Paltey v. Egan [Sup.] 107 N. Y. Supp. 444); but they have application to excavations in a public street (Jencks v. Kenny [Super. Ct.] 19 N. Y. Supp. 243; Brooklyn Elev. R. R. v. City, 2 App. Div. 98, 37 N. Y. Supp. 560). The case, therefore, is to be decided upon the principles of the common law.

If the decision of this appeal depends upon the doctrine of lateral support, I think the defendant would not be liable; but, for the reasons to be presently stated, I am of opinion that it is governed by another principle of law. At common law an owner of land is only entitled to the lateral support of his land against an adjoining owner, where his lands remain in their natural state and the cohesiveness of the soil has not been disturbed by excavations or the erection of structures thereon. Gillies v. Eckerson, 97 App. Div. 153, 89 N. Y. Supp. 609; Riley v. Continuous Rail Joint Company, 110 App. Div. 787, 97 N. Y. Supp. 283; Booth v. R., W. & O. R. R. Co., 140 N. Y. 267, 275, 35 N. E. 592, 24 L. R. A. 105, 37 Am. St. Rep. 552; Dorrity v. Rapp, supra. This street has been extensively excavated and four lines of underground improvements have been placed therein. It is manifest, therefore, that the natural cohesiveness of the soil has been materially affected, and it cannot be said that, if this had not been done, the soil would have been materially disturbed by driving the

sheath piling, the jarring incident to which, it is to be inferred, caused the damages. If, therefore, the plaintiff owned the lot adjacent to that upon which the contractor was excavating and constructing the foundation, and had excavated the soil of its lot and placed therein the structures that it placed in New street, it is quite clear, under the principles of the common law, that there would be no liability. If there would be no liability to the plaintiff for damages to this underground improvement on its own land, I fail to see upon what principle it obtains greater rights in a public street, where it is a licensee, or, at most, has an easement, without title to the soil.

The respondent relies upon the cases of Milburn v. Fowler, 27 Hun, 567, and Finegan v. Eckerson, 32 App. Div. 233, 52 N. Y. Supp. 993, following it; but I think they are distinguishable. It was decided in Radcliffe's Executors v. Mayor, 4 N. Y. 195, 53 Am. Dec. 357, that the common-law rule of lateral support does not obtain in favor of an owner of land abutting upon a public highway, as against the public, and that he is not entitled to the support of his land by the soil in the street. The Milburn and Finegan Cases hold, in favor of those having the right to use the highway for public travel, that an owner of land abutting thereon has no right to make an excavation upon his own land which will so undermine or render insecure the highway as to create a nuisance by causing part of the surface thereof to fall off. Assuming that the nature of the rights of the public in a highway is such that the owner of land abutting thereon owes a duty of lateral support to prevent the creation of a nuisance, it does not necessarily follow that he owes this duty to every owner of underground improvements or structures made or placed in the highway under a license or grant from the public authorities. Moreover, the damage to the plaintiff's property was not caused by an excavation upon the lands of the abutting owner which deprived the soil of the street of lateral support. The excavation here, the construction of which resulted in the damages, was made in the public street itself and by due authority of law. A permit for the construction of a vault in a public highway, for the use of the abutting owner, is in the nature of a revocable private easement. It may be revoked when the space is required for municipal or other public purposes; but, until revoked, it may be fully enjoyed. Lincoln Trust Co. v. City of New York, 96 App. Div. 624, 88 N. Y. Supp. 912; Deshong v. City of New York, 176 N. Y. 475, 68 N. E. 880; March v. City, 69 App. Div. 3, 74 N. Y. Supp. 630, 1151; Babbage v. Powers, 130 N. Y. 282, 29 N. E. 132, 14 L. R. A. 398. The municipal authorities were expressly authorized by the Legislature to grant the right to the abutting owner to construct these vaults, and it has often been decided by the courts that the construction of such vaults in a public street is a proper use of the street, and that the owner's rights therein will be protected while the permit stands unrevoked. Greater New York Charter, Laws 1901, p. 27, c. 466, § 49, subd. 7; Jorgensen v. Squires, 144 N. Y. 280, 39 N. E. 373; Parish v. Baird, 160 N. Y. 302, 54 N. E. 724; Matter of Brooklyn Elevated Railway Co., 105 App. Div. 111, 93 N. Y. Supp. 924; Deshong v. City of New York, 176 N. Y. 475, 68 N. E. 880; 2 Dillon on Mun. Corp. § 664a.

See, also, Lahr v. Met. Ry. Co., 104 N. Y. 268, 10 N. E. 528, and Rogers v. Randall, 29 Mich. 41.

There is, in my opinion, no force in the contention of the respondent that it is a public service corporation and its rights, having been first conferred, are superior to those of the defendant, acting for the owner of the adjacent property to whom the vault permits were granted. The plaintiff obtained its grant subject to the right of the municipal authorities to place in the street other local improvements, even though the construction thereof should require it to take additional precautions for the protection of its property in the street, or subject to greater expense in the maintenance of its property in changing the location thereof. Matter of Deering, 93 N. Y. 361; New Orleans Gas Co. v. Drainage Commission, 197 U. S. 453, 25 Sup. Ct. 471, 49 L. Ed. 831; National Waterworks v. City of Kansas (C. C.) 28 Fed. 921; C., B. & Q. R. R. v. Drainage Commission, 200 U. S. 561, 26 Sup. Ct. 341, 50 L. Ed. 596; Western Union Tel. Co. v. Electric Light Power Co., 178 N. Y. 325, 70 N. E. 866; Brooklyn Elev. R. R. Co. v. City, supra; Interborough Rapid Transit Co. v. Gallagher, 44 Misc. Rep. 536, 90 N. Y. Supp. 104. It likewise took its grant subject to the right of the municipal authorities to exercise their statutory power of granting vault privileges. Doubtless, if the defendant inflicted a direct injury upon the plaintiff's property, it would be liable; but the plaintiff's line of steam pipe over the walls built to protect the same was within that part of the street wherein the construction of the vaults was authorized and the injury was not directly inflicted. It does not appear that any part of the structures placed in the street by the plaintiff was uncovered by the excavation for the vaults, or touched by the piling that was driven in the execution of the work. It does not even appear how near the piling came to any of the plaintiff's underground construction. As already observed, the only inference from the findings is that the jarring or compression of the earth incident to driving the piling caused the damages. There was no caving in toward the vaults, and there is no evidence that the soil of the street or any structure therein settled or was disturbed for want of lateral support.

The findings exonerate the defendant from any charge of negligence. The work was conducted carefully and properly, and the driving of the piling was incidental and necessary to the proper construction of the vaults as authorized by the permits. In view of the findings, there is no force in the suggestion that the permits did not authorize the driving of the piling just outside the curb line; for the abutting owner was authorized to construct the wall of the vaults on the curb line, and it was manifestly necessary to drive the piling outside that line in order to permit the construction of the wall where authorized.

The judgment cannot be sustained upon the theory of trespass. Nothing was thrown upon or against the property of the plaintiff which would justify a recovery upon the theory of trespass without negligence. St. Peter v. Denison, 58 N. Y. 416, 17 Am. Rep. 258, Hay v. Cohoes Co., 2 N. Y. 159, 51 Am. Dec. 279. The case in my opinion falls within the doctrine of Holland House Co. v. Baird, 169 N. Y.

136, 62 N. E. 149, Atwater v. Trustees, etc., 124 N. Y. 602, 27 N. E. 385, Benner v. A. D. Co., 134 N. Y. 156, 31 N. E. 328, 17 L. R. A. 220, 30 Am. St. Rep. 649, and Booth v. R., W. & O. T. R. R. Co., 140 N. Y. 267, 35 N. E. 592, 24 L. R. A. 105, 37 Am. St. Rep. 552, where it is held that in the absence of negligence there is no liability for consequential damages incidentally resulting from the vibrations of the earth or air caused by the construction of a lawful improvement either in a public street or upon private property. The clause of the permit with respect to underground improvements was designed for the protection of those directly encountered in the progress of the work.

It follows, therefore, that the judgment should be reversed, and a new trial granted, with costs to appellant to abide the event.

PATTERSON, P. J., and LAMBERT, J., concur.

McLAUGHLIN, J. (dissenting). I am unable to concur in the opinion of Mr. Justice LAUGHLIN. I think the judgment should be affirmed, for the reasons stated in the opinion of the learned referee. No other rule is practicable in a great city, where the streets are full of pipes laid by various public service corporations, and it is unwise to lay down the rule that, in order to recover for injury thereto, negligence in interfering with them must be shown.

I therefore vote to affirm the judgment.

HOUGHTON, J., concurs.

---

(123 App. Div. 339.)

ROBINSON v. NEW YORK & P. C. R. CO. et al.

(Supreme Court, Appellate Division, First Department. January 10, 1908.)

1. CORPORATIONS—ACTS OF DIRECTORS—INTERFERENCE OF COURTS.

A court of equity will interfere, at the suit of a minority stockholder, to prevent proposed action by the directors elected by and representing the majority stockholders, where the proposed action is so detrimental to the interests of the corporation itself as to lead to the inference that the interests of the majority are outside of and in opposition to the interests of the corporation and the minority stockholders, and the consummation of the scheme would constitute a wanton or fraudulent destruction of the rights of the minority stockholders.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, §§ 668, 1426.]

2. SAME—RAILROADS—CONSOLIDATION CONTRACT—VALIDITY.

The W. Railroad Company, having a charter to construct a railroad between certain termini, notwithstanding its charter had been questioned, had expended $1,700,000 in the acquisition of its right of way, etc., and had contracted for the construction and completion of its road in consideration of the issuance of bonds of the par value of $15,000,000 and stock of the par value of $19,000,000, subscribed for by an underwriting syndicate. The P. Railroad Company was organized for the construction of a road between the same termini, and, being controlled by the same persons who owned a controlling interest in the W. Company, proposed that the two should enter into a contract by which the W. Company should transfer its construction contract, so far as it concerned the portion of the line south of the New York City line, together with all its construction work on that portion of its line under the contract, and convey all its