| 99 | 473 |
|----|-----|
| f102 | 190 |

# MAINE WATER COMPANY

*vs.*

# KNICKERBOCKER STEAM TOWAGE COMPANY.

## SAME *vs.* C. W. CRANE, et als.

### Cumberland.   Opinion February 17, 1905.

*Negligence.   Legislative Powers.   Statutory Construction.   27 U. S. Stat. at Large, 1890, c. 907, §§ 4, 6, 7, 10.   U. S. River and Harbor Act, approved March 3, 1899, §§ 9, 10.*

1.   A water pipe, laid across the Kennebec River at Bath, by authority of an act of the legislature, and in accordance with plans recommended by the Chief of Engineers and authorized by the Secretary of War, is not an unlawful obstruction to the river.

2.   Under section 10 of the River and Harbor Bill of Congress, approved March 3, 1899, a water pipe across the Kennebec River at Bath, if built according to plans recommended by the Chief of Engineers and authorized by the Secretary of War, is deemed to be affirmatively authorized by Congress, and is a lawful structure without any further action by Congress, although the affirmative authority arises by implication.

3.   When only one inference touching negligence can reasonably be drawn from undisputed facts, negligence is a question of law.

4.   When the captain of a schooner which has been taken in tow by a tug boat from its place of anchorage in a river, knew that a water pipe across the river was in his path, and knew where it was, and did not know how much anchor chain he had out when the tug commenced to tow his schooner down river, and took no precaution not to foul the pipe, whether his vessel be towed over it by the tug, or being cast off, drifted over it, and, without protest or notice to the captain of the tug, permitted his vessel to be taken 1500 feet from its anchorage nearly down to the pipe, where the hawser was cast off, the anchor being then at or near the bottom of the river,— *Held,* that the inference of negligence is so unmistakable that no reasonable inference can be drawn to the contrary.

5.   In such case it is no defense that the tugboat was also negligently managed.   When an injury is the result of concurring negligent acts of two parties, one is not exempt from full liability, although the other was equally culpable.

On exceptions by defendant in first case.   Overruled.

On exceptions by plaintiff in second case.   Sustained.

Actions on the case for negligence.

The cases are sufficiently stated in the opinion.

*Symonds, Snow, Cook & Hutchinson, and Benjamin Thompson,* for plaintiff.

*Eugene P. Carver, Edward E. Blodgett, and G. Philip Wardner,* (of Boston, Mass. bar), for defendant, Knickerbocker Steam Towage Company.

*George E. Bird and William M. Bradley,* for defendants, C. W. Crane, et als.

SITTING:   WISWELL, C. J., EMERY, WHITEHOUSE, STROUT, SAVAGE, POWERS, JJ.

SAVAGE, J.   Actions on the case for negligence.   These actions were heard together before the court below, without the intervention of a jury, but with the right of exceptions.   The court found for the plaintiff in the action against the Knickerbocker Towage Co., and for the defendants in the other action.   The defendant took exceptions in the first case, and the plaintiffs in the second.   Both sets of exceptions have been heard together.

The plaintiff's causes of action are based upon the claim that on June 10, 1902, the plaintiff's water pipe, crossing from Bath to Woolwich, upon a structure in the bed of the Kennebec River, was fouled and injured by the anchor of the Jessie Lena, a schooner belonging to the defendants in the second action, which had been taken in tow by the tug boat Seguin, owned and managed by the defendants in the first action, that the conduct of the captain in charge of the Seguin in managing the tow, was negligent, as well as was that of the master of the schooner, and that the negligence of each contributed as a proximate cause to the injury to the water pipe.

1.   The case against the Knickerbocker Towage Co.

The court below found that the Towage Company was guilty of negligence and liable for the injury.   So far as this conclusion rests upon facts, the finding is conclusive, *Treat* v. *Gilmore,* 49 Maine,

34; *Shrimpton* v. *Pendexter*, 88 Maine, 556; *Laroche* v. *Despeaux*, 90 Maine, 178; unless the only inference to be drawn from the evidence is a contrary one, *Morey* v. *Milliken*, 86 Maine, 464. This defendant does not, however, seek a review of the facts, but in argument bases its objection to the conclusion of the court upon a single legal proposition, namely, that the plaintiff had no authority to lay its pipe across the Kennebec River, that the pipe was consequently an unlawful obstruction to navigation, and a nuisance, and hence that the plaintiff as matter of law cannot recover. The conclusion is correct if the premises are sound.

The Kennebec River at Bath is a tidal, navigable river, wholly within this state. It is too well settled to require discussion that in the absence of the exercise by Congress of authority to the contrary, full power resides in the states as to the erection of bridges and other works over or in navigable streams, wholly within their jurisdiction, *Wilson* v. *Blackbird Creek Marsh Co.*, 2 Pet. 245; *Withers* v. *Buckley*, 20 How. 84; *Lake Shore & Mich. Southern Ry.* v. *Ohio*, 165 U. S. 365; and under existing legislation by Congress, that no one can lawfully place an obstruction such as this pipe was across such a river, without the concurrent authority of the state and of the United States government, *Cummings* v. *Chicago*, 188 U. S. 410. It is not questioned but that the pipe was laid by authority of the legislature of this state, and the only remaining question is, did the plaintiff before laying the pipe obtain the requisite authority from the national government? The plaintiff says, yes; the defendant says, no. The true answer depends upon the proper construction of sections 9 and 10 and more particularly of section 10 of the River and Harbor bill enacted by Congress and approved March 3, 1899, which are as follows: —

"Sec. 9. That it shall not be lawful to construct or commence the construction of any bridge, dam, dike or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States, until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of War: Provided,

That such structures may be built under authority of the legislature of a state across rivers and other water ways, the navigable portions of which lie wholly within the limits of a single state, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of War, before construction is commenced: And provided further, that when plans for any bridge or other structure have been approved by the Chief of Engineers and by the Secretary of War, it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of War.

"Sec. 10. That the creation of any obstruction not affirmatively authorized by Congress to the navigable capacity of any of the waters of the United States is hereby prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty or other structures in any port, roadstead, haven, harbor, canal, navigable water or other water of the United States, outside established harbor lines or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of War; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition or capacity of any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War prior to beginning the same."

The case shows that before the pipe line in question was laid the plaintiff submitted its plans and proposed work to the Secretary of War, and asked for authority to lay the pipe. It further appears that the plans and work were recommended by the Chief of Engineers, and authorized by the Secretary of War, and it is not questioned but that the pipe was laid in accordance with the authorized plans.

But the defendant says that is not enough. It contends that the

Secretary of War, under the Act of Congress referred to, had no power to authorize the laying of the pipe. It bases its contention upon the first clause of the first sentence of section 10 of the Act of 1899, which prohibits the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the navigable waters of the United States, and says that this pipe line has not been affirmatively authorized by Congress. It argues that to have been "affirmatively authorized by Congress," there must have been some Act of Congress, general or special, which in terms or by construction was applicable to this pipe line and authorized its construction. The power of the Secretary of War, it is claimed, is limited to the approval of the form of the structure to be built according to plans recommended by the Chief of Engineers, after authority has been obtained by Act of Congress. The defendant asserts that there is no Act of Congress which affirmatively authorizes the laying of this pipe. And our attention has been called to none, unless the very section in question, section 10 of the Act of 1899, is such affirmative authority.

We cannot help remarking, in passing, that if the defendant's interpretation of the Act of 1899 is the correct one, it leads to a rather surprising condition. It would seem that not a wharf or pier, outside established harbor lines, or where no harbor lines have been established, can now be built, in the navigable waters of the United States, not a dolphin can be anchored for mooring vessels, not a boom can be stretched, nor a weir erected for any purpose, until hereafter authorized by Act of Congress. We think it cannot be assumed that Congress intended any such result unless the Act in question is so expressed as not to admit of any other reasonable interpretation.

But the defendant argues not only that the language of prohibition in the clause quoted leads clearly to the conclusion, but that by a contrary construction, it would be plain that the Act of 1899 effected no substantial change in the law as it then existed, applicable to obstructions in navigable waters wholly within the limits of a state, and that it is not to be assumed that Congress intended such a super-

fluity.   A brief examination of the prior legislation by Congress will, we think, throw some light upon this question.

Prior to 1890, Congress had exercised its constitutional powers over the navigable waters of the United States, only in special instances, and with relation to special matters.   But in 1890, by Chap. 907, 27 U. S. Stat. at large, Congress assumed general control over such waters, for the first time.   That Act in section 4 amended a previous provision of law directed against the unreasonable obstruction to free navigation by improperly built draws in bridges.   In section 6 it was made unlawful to throw ballast, stone, rubbish and waste of many specified kinds into any of the navigable waters of the United States, "which shall tend to impede or obstruct navigation."   In section 7 it was made unlawful "to build any wharf, pier, dolphin, boom, dam, weir, breakwater, bulkhead, jetty or structure of any kind in any navigable waters of the United States, where no harbor lines are or may be established, without the permission of the Secretary of War, in any port, navigable river or other waters of the United States, in such manner as shall obstruct navigation, commerce or anchorage of said waters."   The same section made it unlawful "to commence the construction of any bridge, bridge draw, bridge piers and abutments over or in any navigable river or navigable waters of the United States, under any act of the legislative assembly, of any state, until the location and plan of such bridge or other works shall have been submitted to and approved by the Secretary of War, or to excavate and fill, or in any other manner to alter or modify the course, location, condition or capacity of the channel of said navigable water of the United States, unless approved and authorized by the Secretary of War."

There does not seem to be any difficulty in the construction of the Act of 1890, so far.   In relation to so much of the Act as relates to bridges over navigable waters, wholly within the limits of a state, Congress did not assume exclusive jurisdiction.   States were not forbidden to authorize the erection of bridges, but such bridges were not to be erected until the location and plan were approved by the Secretary of War.   It was a limitation upon the power of the states, not a denial of it.   And it seems to be necessarily implied that a

bridge erected under the authority of a state, the location and plans of which had been approved by the Secretary of War, would be a lawful structure, and not an unlawful obstruction to navigable waters. So, if wharves, piers and other structures named in the same connection in the section were erected by permission of the Secretary of War, they could not be said to be unlawful. The declaration of unlawfulness extended only to such as were built without such permission.

Then having impliedly affirmed that the structures named with great particularity would be lawful, if built by the permission or authority of the Secretary of War, as they would have been lawful, under state authority alone, except for this Act, the Act provided in section 10 "that the creation of any obstruction, not affirmatively authorized by law, to the navigable capacity of any waters in respect to which the United States has jurisdiction," was thereby prohibited, and was declared to be a criminal offense, for which appropriate penalties were provided. This general prohibition was comprehensive, but by no sensible construction could it be applied to any of the structures named in section five, if built by the permission or authority of the Secretary of War, which would include a pipe line like that under consideration.

The general purpose of the Act of 1890 is stated by Mr. Justice Brewer in *U. S.* v. *Rio Grande Irrigation Co.*, 174 U. S. 690, in these words:— "Evidently Congress, perceiving that the time had come when the growing interests of commerce required that the navigable waters of the United States should be subjected to the direct control of the National Government, and that nothing should be done by any state tending to destroy that navigability without the explicit assent of the National Government, enacted the statute in question." And we may add that the only explicit assent of the National Government provided for in the Act for the construction of an obstruction like this pipe line was the "permission" to be given by the Secretary of War.

The Act of 1890 remained unchanged so far as relates to anything which concerns this case until 1899, when Congress enacted the Act containing the two sections, 9 and 10, which we have already quoted in full, and about the construction of which this controversy has

arisen.   The changes from the Act of 1890, so far as necessary to notice are these.   The subject matter of former section 7 is divided into two classes.   That relating to bridges and erections of that character is put into the present section 9, and that relating to wharves and similar erections, except dams, which are now classified with bridges in section 9, is found in present section 10.   The Act of 1890, as touching bridges, had reference only to those built under the legislative authority of a state, and simply required in addition the approval of location and plans by the Secretary of War.   The Act of 1899 relates to bridges, dams, dikes and so forth, outside of state jurisdiction, as well as to those within, and it prescribes distinct requirements for each class.   As to the former, it is made unlawful to construct such structures *until the consent of Congress to the building of such structures* is obtained, and until the plans have been approved by the Chief of Engineers and the Secretary of War. While this provision for unlawfulness is general in its terms, and applicable to structures over any navigable water of the United States, it is immediately qualified by the provision that such structures may be built by authority of a state legislature across navigable rivers wholly within the limits of a state by merely securing the approval of the location and plans by the Chief of Engineers and the Secretary of War.   Although it is provided in the first part of the section comprehensively that no bridge structure can lawfully be erected until the consent of Congress to such structure shall have been obtained, can there be any doubt that under this section taken as a whole, the proviso takes effect, and that a bridge across a navigable river wholly within a state, if authorized by the state legislature, and the location and plans properly approved by the Chief of Engineers and the Secretary of War, would be a lawful structure, without the consent of Congress to the structure first obtained, or any other affirmative authorization of Congress except what is contained in the proviso itself?   We think not.

And yet in section 10 the clause in controversy declares that the creation of any obstruction not affirmatively authorized by Congress is prohibited.   Does this prohibition extend to bridges over navigable waters wholly within the state, if authorized by the state, and

if the location and plans are authorized by the Chief of Engineers and the Secretary of War? Clearly not. And yet such a bridge would not be affirmatively authorized by Congress except in the proviso in the section.

The general prohibition in section 10 is brought with only one substantial change from section 10 of the Act of 1890. The Act of 1890 said "not affirmatively authorized by law," which was held in *U. S.* v. *Bellingham Bay Boom Co.*, 176 U. S. 211, to mean not only by a law of Congress, but even by a law of the state in which the river is situated. The Act of 1899 says "not affirmatively authorized by Congress." Following this general prohibition, and immediately connected with it, is the remainder of section 7 of the Act of 1890, which relates to wharves and other structures, which would include this pipe line. The only important change is this. The Act of 1890 made unlawful the erection of such structures without the permission of the Secretary of War, in the waters of the United States, outside established harbor lines, or where no harbor lines have been established, in such manner as shall obstruct or impair navigation. The Act of 1899 makes unlawful such erections, except they are built on plans recommended by the Chief of Engineers and authorized by the Secretary of War.

Although in the arrangement of parts, the general prohibition now is found at the beginning of a section which also relates to the specific regulation of the building of wharves and so forth, instead of being in a section by itself as before, we are not persuaded that Congress, by changing its position, intended to change its effect. It is still general as before. And though general in terms before, we think, as we have stated, that structures impliedly authorized by Congress in the preceding sections were not prohibited. And in its new position we think that the general prohibition is likewise qualified by the sentences which follow. It cannot make any substantial difference whether the general prohibition is at the beginning of a section, or at the end, or in a section by itself, if it clearly appears from the language used and from the context, all taken together, that the legislative intention was that the general prohibition was to be regarded as subject to specified qualifications. When the language,

"The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited" is followed with, "and it shall not be lawful to build . . . . any wharf . . . . or other structures in any . . . navigable river . . except on plans recommended by the Chief of Engineers and authorized by the Secretary of War," the implication seems clear to us that such structures, if built according to plans recommended and authorized as provided in the section, are authorized by Congress, — that they are affirmatively authorized, — though the affirmative authority arises by implication,— and that they are lawful without any further action by Congress.

It is noticeable that when Congress divided the various kinds of obstructions into two classes, it said that bridges and dams, in general, across navigable waters could not be built "until the consent of Congress to the building of such structures" had been obtained, while as to wharves and obstructions of that class, they are lawful if the plans have been recommended by the Chief of Engineers and authorized by the Secretary of War. It seems to us that it may fairly be inferred from the omission of the words in section 10, that it was not intended "that the consent of Congress" by express Act should be a prerequisite to the building of structures named in that section. We think therefore that the objections of the defendant are not tenable.

Our conclusion is much strengthened by the language of the Supreme Court of the United States in *Cummings* v. *Chicago*, 188 U. S. supra. In that case, which related to the building of a dock, the question decided was that the Act of 1899, now under consideration, did not invest a private person, acting under the authority of the national government, with power to erect a dock within the navigable waters of the United States, wholly within the territorial limits of a state, without regard to the wishes of the State upon the subject, but that the right depends upon the concurrent or joint assent of both the national government and the state government. The question involved here was not in issue there. But the court in discussing the Act of 1899 said: "The Secretary of War, acting under the authority conferred by Congress, may consent to the erection of such a structure." This language was subsequently quoted in *Montgomery*

v. *Portland,* 190 U. S. 89.  Though a dictum undoubtedly, it is all we have as yet from the federal Supreme Court, which throws any light upon the question, and it is of value as indicating the trend of judicial thought.

*Exceptions overruled.*

II.  The case against the owners of the "Jessie Lena."

The court below found that the "Jessie Lena" was anchored the night previous to the accident, in the Kennebec River about fifteen hundred feet above the plaintiff's water pipe, in about five fathoms of water and had out about fifteen fathoms of chain.  On the morning of June 10, 1902, she commenced to go down river in tow of the steam tug, Seguin, belonging to the Knickerbocker Towage Co.; that the anchor of the "Jessie Lena" was on or near the river bottom when it reached the pipe, and that the pipe which lay in about forty feet of water was broken by the anchor being hauled up when in that position by the crew of the schooner.  The court further found that the mate of the "Jessie Lena," after the tug's hawser had been made fast to the schooner, "looked over the bow and saw that the schooner had three or four fathoms of scope out on the port bow, and said, 'anchor is not short yet.'  He called to the tug to slack up; that they had not got the anchor off the bottom of the river. This call was heard by the master of the tug, who understood what it meant.  Capt. Devereaux, of the schooner "Jessie Lena," judged that he had left out ten fathoms of chain when the crew got through heaving the anchor before the tug came off.  Capt. Colby, of the tug Seguin, noticed that the chain was right up and down when he made fast to the the schooner.  This fact, observed by him and the answer of Capt. Devereaux to his inquiry as to the condition of the anchor that it was "short," or as Capt. Devereaux says "not much scope out," were acted upon by him, and he turned down the river with the schooner in tow.  The tug steamed up the river a little, and the crew of the schooner commenced to heave the anchor away from the river bottom and continued their work until the schooner passed over

the water pipe. The captain of the Seguin was familiar with the location of the water pipe and the notice warning against anchoring in the locality of the pipe. He cast off the hawser when near the pipes and left the schooner adrift, so that when it passed over the pipe it was not 'under command of either sail or steam or in tow.'" "The captain heard the inquiry of the captain of the steam tug Seguin in regard to the anchor and replied either that it was 'short' or that 'we had not got much scope out.'" When the tug had made fast its hawser and swung down the river, the crew commenced to heave on the anchor, and when it was found breaking out of the mud on the bottom of the river, they continued to heave on it until it passed over the water pipe. The captain knew about where the pipes were located and also what notice was printed on the signs each side of the river. He could not have failed to foresee danger to the pipes from the anchor dragging on the bottom of the river and that the danger would be increased by hauling on the anchor should it foul the pipes. But his statement and that of his crew is, that they noticed no stopping of the schooner or that it had met with any obstruction. The current was running down at three or four knots and a stiff breeze was blowing up river at the time. This may account for the failure of the captain to know that his anchor had caught on the pipe. After the tug had cast off the hawser there was no time for him to take unusual precautions. He had the right to assume that the tow-boat after attaching its hawser was in general charge of the schooner. He received no instructions from the master of the tug, but he kept on hauling up the anchor. The time proved insufficient to raise it so as to clear the pipe. And the court concluded that the accident "cannot under the circumstances be attributed to his negligence. It was the fault of the tug leaving the schooner to drift with the current."

The plaintiff claims that upon the facts thus found by the court, and which for the present purpose must be deemed to be true, the court erred in ruling that the accident cannot under the circumstances be attributed to the negligence of the schooner. The first question is, does this present a question of law or of fact. For if it is a question of fact it is not open on exceptions, even, though as in this case, the evidence is made a part of the bill of exceptions, unless the

only inference to be drawn from the evidence is contrary to the finding. Ordinarily care and negligence are questions of fact, and this is so, even if the circumstances attending it are agreed to or admitted, or are undisputed, when reasonable and fair minded men may arrive at different conclusions. *Grows* v. *Maine Central R. R. Co.,* 67 Maine, 100; *Elwell* v. *Hacker,* 86 Maine, 416; *Romeo* v. *B. M. & R. R.,* 87 Maine, 540. But when only one inference can reasonably be drawn from undisputed facts, or as here, from facts which must be deemed true, negligence is a question of law. *Elwell* v. *Hacker,* 86 Maine, 416; *Blumenthal* v. *B. & M. R. R.,* 97 Maine, 255; and exceptions lie to a ruling thereon.

The court below seems to have concluded that the accident was due solely to the fault of the tug in leaving the schooner to drift with the current. But we think the justice below erred in so concluding. We think that in one respect at least the negligence of the captain of the "Jessie Lena" contributed to the injury, and that the inference of negligence is so unmistakable that no reasonable inference can be drawn to the contrary. He evidently did not know how much anchor chain he had out when the tug commenced to tow his schooner down river. He knew that the water pipe was in his path and he knew where it was. Under these conditions it was his duty to know how much chain he had out, and to take precautions not to foul the pipe, whether his vessel be towed over it by the tug, or being cast off, drifted over it. Without protest or notice to the captain of the tug that he had too much chain out to pass over the pipe safely, he permitted his vessel to be taken fifteen hundred feet from its anchorage, nearly down to the pipe, where the hawser was cast off, and even then the anchor was at or near the bottom of the river. This was negligence beyond a question.

It is no defense to these defendants that the tugboat was also at fault. When the injury is the result of concurring acts of negligence of two parties, one is not exempt from full liability, although the other was equally culpable. *Lake* v. *Milliken,* 62 Maine, 240. Each may be sued separately, and the pendency of a suit against one does not bar or abate the suit against the other. *Cumberland Co.* v. *Central Wharf Tow-Boat Co.,* 90 Maine, 95; *Cleveland* v. *Bangor,*

87 Maine, 259. But though there may be two judgments, there can be only one satisfaction, *Cleveland* v. *Bangor*, supra.

*Exceptions sustained.*