GARRISON, Secretary of War, et al. v. GREENLEAF JOHNSON LUMBER CO.

(Circuit Court of Appeals, Fourth Circuit. June 1, 1914.)

No. 1239.

1. NAVIGABLE WATERS (§ 39*)—RIPARIAN RIGHTS—PARAMOUNT AUTHORITY OF UNITED STATES.

All state laws and regulations with respect to navigable waters, and all rights acquired under them, are subject to the paramount right of the United States to appropriate any portion of the submerged soil for the purposes of navigation.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 21, 53, 82, 103, 112, 117, 127, 239–244; Dec. Dig. § 39.*]

2. EMINENT DOMAIN (§ 2*) — CHANGE OF HARBOR LINE — RIGHTS OF PIER OWNERS.

A harbor line established by the Secretary of War under authority conferred by Congress is subject to change by the same authority, and while a riparian owner may lawfully construct piers and docks to the established line, in doing so he takes the risk of such change if required for the improvement of navigation, which is not a matter for judicial inquiry, and the removal by the government of so much of his structures as extend beyond the new line is not a taking of his property for which he is entitled to compensation.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 3–12; Dec. Dig. § 2.*

Nature and extent of power of United States to condemn property for public use, see note to Town of Nahant v. United States, 70 C. C. A. 653.]

Cross-Appeals from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Suit in equity by the Greenleaf Johnson Lumber Company against Lindley M. Garrison, Secretary of War of the United States, and

<hr>

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Henry S. Breckenridge, Assistant Secretary. From the decree both parties appeal. Reversed on appeal of defendants.

For opinion below, see 208 Fed. 1022.

John L. Jeffries, of Norfolk, Va. (L. D. Starke and Jeffries, Wolcott, Wolcott & Lankford, all of Norfolk, Va., on the brief), for plaintiff.

D. Lawrence Groner, U. S. Atty., of Norfolk, Va. (Hiram M. Smith, Asst. U. S. Atty., of Richmond, Va., on the brief), for defendants.

Before PRITCHARD and WOODS, Circuit Judges, and DAYTON, District Judge.

WOODS, Circuit Judge. The complainant, owner of about eight acres of land on the Elizabeth river opposite the navy yard at Norfolk, Va., brought this suit to enjoin the Secretary of War from threatened removal of its wharf and other structures used in its business as a manufacturer and shipper of lumber. The District Court overruled a demurrer to the bill and after hearing the answer and testimony on issues of fact granted a permanent injunction, holding that removal of the wharves and other structures would be taking private property without compensation.

There is little dispute as to the facts. Under the law of Virginia the complainant, as riparian owner, has fee-simple title to low-water mark in the bed of the river. At some time before the year 1873, the complainant built a wharf for shipping its manufactured lumber, and by means of piles enclosed enough water surface to make a pond for logs floated down the river for manufacture. As nearly as can be ascertained the first port warden or harbor line, which indicated the limit beyond which riparian owners could not use the water front, was established at this point in the river in 1876, by harbor commissioners under authority conferred by statute law of Virginia. When the harbor line was established it turned out that the complainant's wharf and log pond was outside the line of navigation. In 1883 or 1884 the wharf and other structures were improved and enlarged to their present dimensions, still not extending beyond the line of navigation. In 1890 the same harbor line was adopted by the Secretary of War in behalf of the United States under authority conferred by act of Congress, as the national government's limit of navigable water. On June 12, 1911, the Secretary of War under the authority of an act of Congress established a new navigation or harbor line, which brings a portion of complainant's structures within the navigable area of the river. The complainant was notified of the change, and the necessity of the removal of its structures; and negotiations for settlement of complainant's claim for compensation indicated an acknowledgment of the right of compensation by the officials of the office of the Secretary of War. Agreement could not be reached as to the value, and condemnation proceedings were instituted on behalf of the government. While these proceedings were pending, the Secretary of War, taking the position that the complainant had assumed the risk of estab-

215 F.—37

lishment and change in the line of navigation when it located its structures, abandoned the condemnation proceedings and notified complainant of his intention to remove whatever portion of its structures fell within the new line of navigation. Thereupon the complainant, claiming the right of compensation, brought this suit for injunction.

[1] The general principles under which the relative rights of the owner of the shore of navigable water and of the state, and of the United States are to be determined have been so often and so elaborately set out by the Supreme Court of the United States and other tribunals that they require no discussion. The extent of the title and of the rights of the riparian owner in the soil under navigable water is fixed by state law, and under the law of Virginia the complainant owned the soil under the water to low-water mark. But all state laws and regulations with respect to navigable waters, and all rights acquired under them, are subject to the paramount right of the United States to appropriate any portion of the submerged soil for purposes of navigation. Hence the appropriation by the United States for purposes of navigation of the soil under the water to which the complainant has title under the state law is not a taking of private property, and the complainant has no right to compensation therefor.

[2] Under this principle, that the use and title of the riparian owner is subject to the dominant right of the United States, it has been held that it is not taking private property to require a bridge to be changed or removed, or a tunnel to be lowered, or to erect dams or dykes which incidentally cut off access to deep water, or access to a landing in the channel, or to flood lands by the erection of revetments along the banks of a navigable stream. Gilman v. Philadelphia, 3 Wall. 713, 18 L. Ed. 96; Illinois Cen. R. R. v. Illinois, 146 U. S. 446, 13 Sup Ct. 110, 36 L. Ed. 1018; Shively v. Bowlsby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331; Gibson v. United States, 166 U. S. 269, 17 Sup. Ct. 578, 41 L. Ed. 996; Scranton v. Wheeler, 179 U. S. 141, 21 Sup. Ct. 48, 45 L. Ed. 126; Bedford v. United States, 192 U. S. 217, 24 Sup. Ct. 238, 48 L. Ed. 414; C., B. & Q. Ry. Co. v. Illinois ex rel. Grimwood, 200 U. S. 561, 26 Sup. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175; West Chicago R. R. v. Chicago, 201 U. S. 506, 26 Sup. Ct. 518, 50 L. Ed. 845; Union Bridge Co. v. United States, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523; Monongahela Bridge Co. v. United States, 216 U. S. 177, 30 Sup. Ct. 356, 54 L. Ed. 435; Hannibal Bridge Co. v. United States, 221 U. S. 194, 31 Sup. Ct. 603, 55 L. Ed. 699; Philadelphia Co. v. Stimson, 223 U. S. 605, 32 Sup. Ct. 340, 56 L. Ed. 570. This dominant right of the United States is thus stated in Union Bridge Co. v. United States, supra:

"Although the bridge, when erected under the authority of a Pennsylvania charter, may have been a lawful structure, and although it may not have been an unreasonable obstruction to commerce and navigation *as then carried on*, it must be taken, under the cases cited, and upon principle, not only that the company when exerting the power conferred upon it by the state, did so with knowledge of the paramount authority of Congress to regulate commerce among the States, but that it erected the bridge subject to the possibility that Congress might, at some future time, when the public interest demanded, exert its power by appropriate legislation to protect navigation against unreasonable obstructions."

In Scranton v. Wheeler, supra, the court uses this language:

"The primary use of the waters and the lands under them is for purposes of navigation, and the erection of piers in them to improve navigation for the public is entirely consistent with such use, and infringes no right of the riparian owner. Whatever the nature of the interest of a riparian owner in the submerged lands in front of his upland bordering on a public navigable water, his title is not as full and complete as his title to fast land which has no direct connection with the navigation of such water. It is a qualified title, a bare technical title, not at his absolute disposal, as is his upland, but to be held at all times subordinate to such use of the submerged lands and of the waters flowing over them as may be consistent with or demanded by the public right of navigation."

In applying the general principle in many forms these authorities left open the specific question on which this case depends: Is the establishment of harbor lines or lines of navigation under authority of the act of Congress such a consent or invitation by the United States to riparian owners to build to that line wharves and other structures that such structures must be regarded, as against the United States, private property which cannot be taken without compensation even for purposes of navigation? In Yesler v. Washington Harbor Line, 146 U. S. 646, 13 Sup. Ct. 190, 36 L. Ed. 1119, a harbor line is defined as the line beyond which wharves and other structures cannot be extended. Prosser v. Northern Pac. Ry., 152 U. S. 59, 14 Sup. Ct. 528, 38 L. Ed. 352. In these two cases it was held that the mere laying out of new harbor lines so as to include structures before without the harbor lines was not a taking of private property without compensation; but the court expressly left open the question whether requiring the removal of such structures up to the line would be a taking of private property. As to such a structure as a bridge not used in direct aid of navigation, it was held in Philadelphia v. Stimson, supra, that the harbor line might be changed, and that the bridge company could not claim compensation when required to move its bridge to conform to the new line.

The case then comes to the still more definite question whether on the point at issue there is a distinction between bridges, and other like structures not directly aiding navigation, and wharves and other structures used for purposes of navigation. Laying aside for the moment the statute on the subject, the argument in favor of the distinction may be thus stated: The nation holds the navigable waters of the country in trust to keep them open for the free use of all in so far as it is possible for all to enjoy them in common, and to allow the riparian owner to promote navigation by the erection of wharves and other structures. While the first use is paramount and the other subordinate, the latter is very important to the public, inasmuch as it is impossible for the United States to erect and maintain all the piers, wharves, and other structures necessary to the conduct and advancement of navigation along the numerous navigable streams. This use of the riparian owner for his own good and the public good would be greatly impaired unless the dominant right to free public navigation be so managed as to give it stability and certainty. It is for the purpose of giving this stability that the government establishes harbor lines. Hence it may

be argued that the fixing of the lines should be regarded as an invitation to the riparian owner to come to that line and promote his own interest and that of the public by erecting wharves and other structures in aid of commerce. These lines are established, it is true, to limit, but they are established also to promote the use of the water by giving to it the assurance of stability. At many places the use of the soil under the water is of vast value if it can be depended on as stable, but this value would shrink to nothing if laying out the harbor line gave no assurance of stable use. Permanent and expensive docks and wharves would not be erected if they could be taken without compensation.

If this argument be sound, and the laying out of harbor lines be regarded as an assurance to the riparian owner that he may safely invest in wharves and piers erected by him in aid of navigation, the case of Monongahela Navigation Co. v. United States, 148 U. S. 312, 13 Sup. Ct. 622, 37 L. Ed. 463, would be conclusive authority that for the taking of such wharves compensation must be made. It is true that case, in some of its expressions, seems to be irreconcilable with some of the later cases above cited. But its authority was recognized in Lewis Blue Point Oyster Co. v. Briggs, 229 U. S. 82, 33 Sup. Ct. 679, 57 L. Ed. 1083, for the proposition that structures erected in a navigable stream under the affirmative authorization of the United States could not be removed without compensation even in promotion of navigation.

The statute of 1888 (Act Aug. 11, 1888, c. 860, 25 Stat. 425) under which the harbor line here involved was established is as follows:

"Sec. 12. Where it is made manifest to the Secretary of War that the establishment of harbor lines is essential to the preservation and protection of harbors, he may, and is hereby, authorized to cause such lines to be established, beyond which no piers or wharves shall be extended or deposits made except under such regulations as may be prescribed from time to time by him."

The argument is not without force that while this authorization to the Secretary of War is negative in form, yet when it is taken in connection with the power conferred on him to grant permission, under regulations prescribed by him, to erect structures beyond the harbor line, it implies affirmative authorization to the riparian owner to erect structures to the harbor line without special authorization. In construing a similar provision of the act of 1899 (Act March 3, 1899, c. 425, 30 Stat. 1151 [U. S. Comp. St. 1901, p. 3541]), the Supreme Judicial Court of Maine, in Maine Water Co. v. Knickerbocker, etc., Co., 99 Me. 473, 59 Atl. 953, after elaborate discussion, held that the statute necessarily implied affirmative authorization.

We have thus stated what appears to us the strongest considerations in favor of the claims of the complainant. It cannot be doubted, however, that the Supreme Court of the United States in its later decisions has taken the larger view that under the Constitution of the United States the control and development of all navigable streams remains in the federal government, and that no rights can be acquired against it except under affirmative conferment of Congress, that the harbor lines of the federal government designating the limit of navigation are

changeable at its discretion, and that all who build wharves or other structures in, under, or over the water of navigable streams take the risk of whatever Congress either directly or through the Secretary of War may see fit to do for the promotion of navigation. All doubt upon these propositions seems to be set at rest by United States v. Chandler-Dunbar Co., 229 U. S. 53, 33 Sup. Ct. 667, 57 L. Ed. 1063, and Lewis Blue Point Oyster Co. v. Briggs, 229 U. S. 82, 33 Sup. Ct. 679, 57 L. Ed. 1083. In the former case Mr. Justice Lurton thus treats the very question here involved:

"That riparian owners upon public navigable rivers have, in addition to the rights common to the public, certain rights to the use and enjoyment of the stream which are incident to such ownership of the bank must be conceded. These additional rights are not dependent upon title to the soil over which the river flows, but are incident to ownership upon the bank. Among these rights of use and enjoyment is the right, as against other riparian owners, to have the stream come to them substantially in its natural state, both in quantity and quality. They have also the right of access to deep water, and when not forbidden by public law may construct for this purpose wharves, docks, and piers in the shallow water of the shore. But every such structure in the water of a navigable river is subordinate to the right of navigation, and subject to the obligation to suffer the consequences of the improvement of navigation, and must be removed if Congress in the assertion of its power over navigation shall determine that their continuance is detrimental to the public interest in the navigation of the river."

It is true in that case the license from the Secretary of War under which the Chandler-Dunbar Company constructed its works for utilizing the water power was, by its terms, revocable at will, but it cannot be doubted that the court puts piers and wharves on the same footing as other structures like bridges and waterworks; and it was expressly decided in Philadelphia v. Stimson that as to these the lines of navigation were changeable at will, and that the owner took the risk of change. The Chandler-Dunbar Company Case also holds that the propriety of the change in navigable water under the authority of Congress is not a matter for judicial inquiry.

The argument that this view of the meaning of harbor lines and of the power of the Congress will impede rather than promote navigation by discouraging private enterprise in the construction of wharves and piers loses much of its force when it is remembered that riparian owners may well assume that changes in the harbor lines requiring the removal of valuable structures will not be made by the government except where clearly necessary for the promotion of navigation.

Reversed.