**SOUND MARINE & MACHINE CORPORATION v. WESTCHESTER COUNTY.**

District Court, S. D. New York.
July 29, 1936.

Eugene M. Schwarzenberg and James H. Hickey, both of New York City (James H. Hickey, of New York City, of counsel), for .libelant.

William A. Davidson, Co. Atty., of White Plains, N. Y. (Frank J. Claydon, of White Plains, N. Y., of counsel), for libelee.

HULBERT, District Judge.

The suit is in admiralty, which is sometimes assumed to possess all of the jurisdiction of a court of equity.

Karl M. Goldsmith owned a parcel of land, consisting of five lots on the south side of Mamaroneck Harbor, on the Rushmore Shore Front, Orienta Peninsula, town of Mamaroneck, Westchester county, N. Y., and the land under the waters of Indian creek ·in front of and adjacent to said premises, upon which was erected a wharf and buildings wherein Goldsmith conducted the business of building, repairing, and storing yachts. Eventually, the business was incorporated under the name of Sound Machine Shop, Inc. The certificate of incorporation, filed May 29, 1917, specified the corporate existence of the corporation as ten years. The real estate in question was not transferred to the corporation *until January 25, 1926;* meanwhile the corporate name was changed to the Sound Marine & Machine Corporation. More than two years after the date when the life of the corporation expired by limitation, a new corporation was formed under identically the same name and all of the assets of the libelant were transferred to it *except* the real estate, which was not so conveyed until 1935 (after the commencement of this action).

In 1929, the county of Westchester began the construction of a sewer, and sewer pipes, five feet in diameter, were laid across the channel affording access to libelant's property, which, when the sewer was completed, did not have ingress or egress *at low tide* for tugs, barges, or other water craft of greater draft than six feet. Hence libelant sues to compel the county of Westchester to abate such nuisance and lower said sewer and sewer pipes so that they shall insure a 10′ access channel to **its** property, or, in the alternative, pay to the libelant the amount which its property has been damaged because of the alleged unlawful construction and maintenance of said sewer.

In its answer, the libelee set up that the libelant was neither the real party in interest nor the proper party to sue. It was contended by the libelant upon the trial that its directors were trustees for the purpose of winding up its affairs and could bring this action in the name of the corporation (chapter 552 of the Laws of New York 1932, § 3, amending General Corporation Law [Consol.Laws c. 23] § 29), and only the Attorney General of this state could raise the objection of corporate existence. Thereupon the libelee expressly waived its objections (as it had the right to do, if so advised) and, at the close of the trial, attempted to waive any existing objection that this court is without jurisdiction in admiralty, by joining with the libelant in requesting a determination of the action upon the merits.

Originally, the main channel from Long Island Sound to the town dock at the village of Mamaroneck followed a course to the westerly and northerly of Harbor Island, and passed the property of Goldsmith. But, before the incorporation of the libelant, the United States government, pursuant to Congressional authorization, dredged a new main channel *to the eastward* of Harbor Island. The libelant contends, however, that the old main channel, now referred to as the access channel, retained the characteristics of a navigable channel, and was, in fact, maintained by the government as such, and produced from the local office of the Army Engineering Corps, several maps showing that the area had been dredged to 10′ at M. L. W. in 1925 and 1931. The libelee, on the other hand, insists that when the new, straighter, and deeper channel came into existence and use, the old main channel was abandoned.

The evidence satisfies me that the dredging done in 1925, although by a government dredge, was under a contract with the village of Mamaroneck to obtain fill for an area of marsh converted into a park and bathing beach as part of a project of the village for beautifying the harbor, and, while the dredging thus done was in approximately the same area as was contained within the old channel lines, it did not conform exactly and was not dredged to any uniform depth. It is also clear that the dredging in 1931 was likewise done at the

behest and for the benefit of the village of Mamaroneck, and had no relation to the maintenance of the so-called access channel as a government enterprise. Indeed, the proof is that, although the project at that time was to dredge the area to 8′ at M. L. W. and the map indicates that it was dredged to 10′ at M. L. W., it was actually dredged to 6½′ at M. L. W. and the sewer outlet did not interfere with that dredging.

The evidence is very scant as to the draft of boats which, before the sewer outlet was built in 1929, had access to the property presently owned by the libelant, as compared with those having access since that time. Nearly half a century ago, the steamers Mary Gordon and Irene E. Davis, carrying both passengers and freight, operated from New York City to Mamaroneck. Each of these ships had a maximum draft of 8′ loaded and used the old main channel, but they never navigated that channel at low tide and often waited "outside" six and seven hours for a rising tide. There was also some proof that a tug of the Scott salvage corporation had taken scows up the old main channel to libelant's premises on Indian creek, but it does not appear competently what the draft of the tug and scows or the stage of the tide was. At the suggestion of the court, the case was reopened and continued for some days for the purpose of supplying testimony of that very character, but taking the proof in the most favorable light to the libelant, the sewer outlet is now at least 5′ below water and M. L. W. and there is a rise and fall of the tide of about 6 feet in that part of the Harbor.

The Rivers and Harbors Appropriation Act of March 3, 1899 (title 33 U.S.C.A. § 401 et seq.) provides in part as follows: Section 10 (33 U.S.C.A. § 403). "The creation of any obstruction not affirmatively authorized by congress, to the navigable capacity of any of the waters of the United States is hereby prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of War; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War prior to beginning the same."

It is conceded that the installation of the outlet sewer pipe was not specifically authorized by an act of Congress, but it is contended by libelee that since the area in question lies wholly within the state of New York, that sovereignty may do as it wills, subject to the paramount jurisdiction of the United States in connection with its control of commerce. Therefore, the libelee submits a permit of the Secretary of War, issued pursuant to section 10, supra, and also an easement from the commissioners of the land office of the state of New York covering the area of sewer construction under the waters of Mamaroneck Harbor and contends that it obtained proper authorization for the work and has complied with all pertinent provisions of section 10, supra, but the libelant argues that nothing short of an act of the Congress is sufficient and that "affirmative authorization" is lacking in this case.

The language used by Chief Justice Taft, writing for the Supreme Court in Wisconsin v. Illinois, 278 U.S. 367, 49 S. Ct. 163, 73 L.Ed. 426, in dealing with the very statute here involved, seems particularly in point. He said, 278 U.S. 367, at page 412, et seq., 49 S.Ct. 163, 169, 73 L. Ed. 426:

"The policy carried out in the Act of March 3, 1899, had been begun in the Act of September 19, 1890, c. 907, 26 Stat. [426] 454, 455. Sections 9 and 10 [33 U.S.C.A. §§ 401, 403] were the rearranged result of the provisions of sections 7 and 10 of the act of 1890. A new classification was made in sections 9 and 10 of the act of 1899, and substituted for section 10 of the act of 1890. The latter provided that the creation of any obstruction to navigable capacity was prohibited, unless 'affirmatively authorized by law' (33 U.S.C.A. § 403a), and this was changed so as to read 'affirmatively authorized by Congress.' 33 U.S.C. A. § 403. The change in the words of the first clause of section 10 was intended to make mere state authorization inadequate. [Citing cases.] It was not intended to override the authority of the state to put

its veto upon the placing of obstructing structures in navigable waters within a state, and both state and federal approval were made necessary in such case. Cummings v. Chicago, 188 U.S. 410, 23 S.Ct. 472, 47 L.Ed. 525. The words 'affirmatively authorized by Congress' should be construed in the light of the administrative exigencies which prompted the delegation of authority in the succeeding clauses. Congress, having stated in section 9 as to what particular structures its specific consent should be required, intended to leave to the Secretary of War, acting on the recommendation of the Chief of Engineers, the determination of what should be approved and authorized in the classes of cases described in the second and third clauses of section 10. If the section were construed to require a special authorization by Congress whenever in any aspect it might be considered that there was an obstruction to navigable capacity, none of the undertakings specifically provided for in the second and third clauses of section 10 could safely be undertaken without a special authorization of Congress. We do not think this was intended. The Supreme Court of Maine, in Maine Water Co. v. Knickerbocker Steam Towage Co., 99 Me. 473, 59 A. 953, took the same general view in construction of the same section. It held that the broad words of the first clause of that section were not intended to limit the second and third clauses and that Congress' purpose was a direct prohibition of what was forbidden by them, except when affirmatively approved by the Chief of Engineers and the Secretary of War. We concur in this view.

"The true intent of the act of Congress was that unreasonable obstructions to navigation and navigable capacity were to be prohibited, and, in the cases described in the second and third clauses of section 10, the Secretary of War, acting on the recommendation of the Chief of Engineers, was authorized to determine what in the particular cases constituted an unreasonable obstruction.

"This construction of section 10 is sustained by the uniform practice of the War Department for nearly thirty years. Nothing is more convincing in interpretation of a doubtful or ambiguous statute. [Citing cases.]"

Thus two questions are presented:

(1) Does the sewer pipe obstruct a navigable channel?

(2) If so, is the libelee relieved from liability for the obstruction because of the authorization obtained for its construction?

But before making answer to those questions, I must give consideration to the admiralty jurisdiction of the court. I do this most reluctantly, because the trial of this case was a rather protracted one, both counsel have fully and carefully briefed the issues and I am sympathetic with their desire to have a final determination upon the merits.

Nevertheless, the jurisdiction of this court is a limited one (Grace v. American Central Ins. Co., 109 U.S. 278, 3 S.Ct. 207, 27 L.Ed. 932) and must be affirmatively established (Robertson v. Cease, 97 U.S. 646, 24 L.Ed. 1057). There are no presumptions in favor of the jurisdiction of the courts of the United States. Ex parte Smith, 94 U.S. 455, 24 L.Ed. 165. Not only is it true that jurisdiction cannot be conferred by waiver of objections thereto, but it cannot be conferred by the consent of all the parties. This principle, although so well settled in federal practice that citation of authority is superfluous, was clearly enunciated by Mr. Justice Harlan in Metcalf v. Watertown, 128 U.S. 586, at page 587, 9 S.Ct. 173, 32 L.Ed. 543, when he said: "We are not, however, at liberty to express any opinion upon the question of limitation, if the court, whose judgment has been brought here for review, does not appear, from the record, to have had jurisdiction of the case; and whether that court had or had not jurisdiction is a question which we must examine and determine, even if the parties forbear to make it, or consent that the case be considered upon its merits. [Citing cases.]"

Admiralty jurisdiction in the federal courts is derived from only two sources. The Constitution (article 3, § 2, cl. 1) provides: "The judicial Power shall extend * * * to all Cases of admiralty and maritime Jurisdiction."

In making division of the constitutional grants of power, the Congress passed the Judiciary Law of 1789 which, as since amended, now provides (title 28 U.S.C.A. §§ 41 (3) and 371) as follows:

28 U.S.C.A. Sec. 41. "The district courts shall have original jurisdiction as follows: * * * (3) Third. Of all civil causes of admiralty and maritime jurisdiction, saving to suitors in all cases the

right of a common-law remedy where the common law is competent to give it, and to claimants for compensation for injuries to or death of persons other than the master or members of the crew of a vessel their rights and remedies under the workmen's compensation law of any State, District, Territory, or possession of the United States, which rights and remedies when conferred by such law shall be exclusive; of all seizures on land or waters not within admiralty and maritime jurisdiction; of all prizes brought into the United States; and of all proceedings for the condemnation of property taken as prize. The jurisdiction of the district courts shall not extend to causes arising out of injuries to or death of persons other than the master or members of the crew, for which compensation is provided by the workmen's compensation law of any State, District, Territory, or possession of the United States."

28 U.S.C.A. Sec. 371. "The jurisdiction vested in the courts of the United States in the cases and proceedings hereinafter mentioned, shall be exclusive of the courts of the several States: * * *

"Third. Of all civil causes of admiralty and maritime jurisdiction, saving to suitors in all cases the right of a common-law remedy where the common law is competent to give it and to claimants for compensation for injuries to or death of persons other than the master or members of the crew of a vessel, their rights and remedies under the workmen's compensation law of any State, District, Territory, or possession of the United States."

■ Can this suit be maintained under the authority of one or the other of these provisions?

The libelant, on the theory that this is a tort action and that only the locality of the tort is determinative of jurisdiction, cites The Blackheath, 195 U.S. 361, 25 S.Ct. 46, 49 L.Ed. 236; The Raithmoor, 241 U.S. 166, 36 S.Ct. 514, 60 L.Ed. 937; and Doullut & Williams Co., Inc., v. U. S., 268 U.S. 33, 45 S.Ct. 411, 69 L.Ed. 832. While to some extent the language in these cases appears to support the contention of the libelant, I am not persuaded that it was so intended. The torts involved in these and similar cases dealing with jurisdiction because of "locality," all seem to have been those causing personal injury or death or where injury to navigating vessels resulted from negligence and the "locality" spoken of depended upon whether the tort was committed on the high seas, other navigable waters or appurtenances connected to the shore, or the shore itself.

I have searched diligently, but in vain, for any case from 1789 to date where a shore owner was damaged by interference with the access to his property and obtained relief in *admiralty*. There are many cases of that character where the relief was had in *equity* or at *common law*.

It is significant, too, that no case was cited, nor have I been able to find any, arising under the statute here involved or the other related sections of the Rivers and Harbors Act of 1899, where the abatement of the obstruction or damages in lieu thereof, was obtained in *admiralty*.

On the affirmative side, our own Circuit Court of Appeals, writing through Judge Rogers, in The Poznan, 9 F.(2d) 838, at page 846, said:

"Courts of admiralty, it is sometimes said, are courts of equity. This is because the principles of equity rather than the strict rules of the common law are those upon which the courts of admiralty act. But it is perfectly clear that a court of admiralty is not a court of equity, and that it is not entitled to draw within its jurisdiction matters primarily of nonmaritime jurisdiction. [Citing cases.]

"In the separate and concurring opinion of the present writer in The Ada, 250 F. 194, 198, 162 C.C.A. 330, 334, it was said: 'I also agree that courts of admiralty, having obtained jurisdiction, do not dispose of nonmaritime subjects, after the manner of courts of equity, for the purpose of doing complete justice. While admiralty courts act as courts of equity so far as their powers go, their powers are limited to maritime contracts or transactions, and they have no general jurisdiction to administer relief as courts of equity, or to administer complete relief. They differ, too, from the equity courts, in that they do not undertake to determine equitable rights.'"

To like effect, see United Transp. & Lighterage Co. v. New York & Baltimore Transp. Line (D.C.) 180 F. 902, affirmed (C.C.A.) 185 F. 386; The Kearney (C.C.A.) 14 F.(2d) 949.

Recently the United States Supreme Court held that, while courts of admiralty have capacity to apply equitable principles in order the better to attain justice, they do

not have general equitable jurisdiction and, *except in limitation of liability proceedings, they do not issue injunctions.* Schoenamsgruber v. Hamburg American Line, 294 U.S. 454, 55 S.Ct. 475, 79 L.Ed. 989.

Finally, the case of Streckfus Steamers, Inc., v. Mayor and Board of Aldermen of City of Vicksburg (D.C.) 10 F.Supp. 529, seems to be controlling. There the action was brought to enjoin the collection of a privilege tax levied on operators of steamboat excursions from the wharves of Vicksburg, Miss. The libelants were subject to the provisions of the tax and, after the tax was levied and some proceedings had been had in the state court in relation thereto, the suit in question was brought and trial was held in the *admiralty* part of the United States District Court.

In the early part of his opinion, Judge Holmes said: "The proceeding is in admiralty, although it seeks only equitable relief, but this is the forum deliberately chosen by the litigant. There is no question of the case being on the wrong docket by mistake. The clerk first entered it in equity, but it was transferred to the admiralty docket. This was done on motion of the proctor for the libelant, who says that he intended to file it in the admiralty court and insists that this is the court in which it properly belongs. The reason, good or bad, for his choice of this forum may be gleaned from his conception of the advantages to be gained in the extensive jurisdiction which, he claims, courts of admiralty exercise. In his brief in chief on the merits, it is stated: 'At the outset we desire to impress upon the Court that this action is in Admiralty; that the Court has taken jurisdiction under Admiralty, and that the jurisdiction is peculiar in that it is absolutely exclusive, albeit all-embracing. The three other jurisdictions of the District Courts, i. e., criminal, law, and equity, are all three embraced within the Admiralty, because a court of Admiralty sits as any one of the other three, yet neither of the other three may sit in Admiralty. Thus its exclusiveness and omnipotence. Such is this peculiar jurisdiction.' He further contends that while admiralty proceeds upon equitable principles, and administers equitable remedies, it is not fettered by the equitable restriction that no suit in equity may be maintained where the plaintiff has a plain, adequate, and complete remedy at law. With this contention he seeks to avoid the direct ruling in Matthews v.

Rodgers, 284 U.S. 521, 52 S.Ct. 217, 76 L.Ed. 447, that, in Mississippi, the taxpayer ordinarily has a plain, adequate, and complete remedy at law by paying an illegal tax and suing to recover it."

Basing its decision on Schoenamsgruber v. Hamburg American Line, 294 U.S. 454, 55 S.Ct. 475, 79 L.Ed. 989, cited above, the court dismissed the libel because of lack of jurisdiction with leave to plead over in equity or pay the tax and sue at law to recover it.

What, in its broadest possible interpretation, is the theory of this action? Is it not squarely an equity action to abate a nuisance or, in the alternative, a common-law action for damages therefore? I am clear that it is just that and, following the authorities cited above, the admiralty part of this court has no jurisdiction of such an action.

Regretful as I am to dispose of this case on what might loosely be termed a technicality but is, in fact, a vital defect, the libel must be dismissed for lack of jurisdiction without prejudice to a proper action in equity or common law in whatever court libelant may be advised.

If these findings do not conform to Admiralty Rule 46½, 28 U.S.C.A. following section 723, either party may submit findings of fact and conclusions of law on five days' notice to the other.